*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CT-0494

TERRENCE MELVIN KOONCE, APPELLANT,

v.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CTF-18919-12)

(Hon. Franklin A. Burgess, Motions Judge,
Hon. Ronna L. Beck, Trial Judge)

(Submitted October 31, 2014                    Decided March 19, 2015)

*Nicholas Q. Elton* was on the brief for appellant.

*Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Rosalyn C. Groce*, Deputy Solicitor General, and *Janice Y. Sheppard*, Assistant Attorney General, were on the brief for appellee.

Before BLACKBURNE-RIGSBY and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

Opinion for the court by *Senior Judge* RUIZ.

Concurring opinion by *Associate Judge* MCLEESE at page 30.

RUIZ, *Senior Judge*:  Appellant Terrence Melvin Koonce was convicted by a

jury of driving under the influence ("DUI"), in violation of D.C. Code § 50-

2206.11 (2012 Repl.).[1]  Appellant contends that the trial judge committed errors requiring reversal of the conviction by:  (1) failing to impose an appropriate sanction after finding that the government did not preserve video evidence that was subject to discovery; (2) failing to suppress photographs of a liquor bottle the police claimed to have found in appellant's car as a sanction for not preserving the bottle itself; and (3) giving a DUI testing refusal jury instruction.  Although we agree with appellant's claim that he should have been able to obtain the requested video and liquor bottle through discovery, we conclude that the trial court did not commit error in the actions it took in response to the government's failure to preserve and produce these items of evidence, or in instructing the jury.  Therefore, we affirm appellant's conviction.

## I.      Factual and Procedural Background

Late in the evening on November 2, 2012, appellant was involved in a multi-car accident on the 1400 block of Varnum Street, Northwest, Washington, D.C.  The SUV appellant was driving collided with a Nissan Maxima, which in turn collided with a black Volkswagen, and the Volkswagen then crashed into a Honda Accord.  Four cars were involved in this initial collision.  Appellant then continued

---

[1]  A separate charge of operating while impaired ("OWI"), in violation of D.C. Code § 50-2206.14 (2012 Repl.), was dismissed *nolle prosequi*.

to drive westbound on Varnum Street, and when he attempted to turn north, the SUV collided with a Dodge pickup truck. Appellant's SUV spun the truck around, and the SUV collided with yet another car, traveling northbound. This collision left appellant's SUV immobile, as the SUV became "locked into the left rear quarter panel" of the pickup truck. Appellant's SUV had sustained significant damage to the front end and was missing a tire on the passenger side of the vehicle. The SUV appeared to have traveled some distance without the tire, driving on its rim.

Mr. Lloyd Bing, who lived on Varnum Street, left his home upon hearing the initial collision, observed appellant attempt to drive away from the scene of the accident, and saw the subsequent collisions. After appellant's SUV came to a stop when it became locked with the Dodge pickup truck, Mr. Bing approached appellant's SUV and called 9-1-1. He believed appellant was intoxicated based on his speech and movements. Metropolitan Police Department (MPD) officers responded to the scene of the accident, and testified that appellant "swayed back and forth," had "slurred speech," and a "strong odor of alcohol emanating from [his] breath." Appellant was also "argumentative and belligerent." Police officers found two open bottles in appellant's car; one of vodka, and one of cranberry juice. The vodka bottle was removed, photographed, and discarded. MPD Officer Clifton Murphy testified at trial, while observing photographic evidence of the

vodka bottle, that the seal had been broken and the bottle was approximately ninety-percent full.

At the scene of the accident, MPD Officer Oxenrider-Murphy[2] asked appellant to submit to a series of field sobriety tests. Appellant stated "[I am] not as drunk as they think I am," and refused to submit to the field tests after being informed that he could lose his license for up to one year if he did not agree to be tested. When asked again, appellant "very loudly and belligerently" responded by saying "[r]evoke it for six months." Appellant was asked three times to submit to a field sobriety test. Appellant was arrested and taken to the MPD Fourth District station where he was placed in a holding cell. Officer Oxenrider-Murphy asked appellant if he would provide a urine sample; appellant stated he would not. When asked if he was refusing to provide a sample, appellant responded in the affirmative. Officer Oxenrider-Murphy left to retrieve the chemical/blood testing Implied Consent Form,[3] but upon returning, the officer found that appellant was

---

[2] Officer Murphy and Oxenrider-Murphy are married.

[3] Officer Oxenrider-Murphy testified that the Implied Consent Form is a standardized form that must be read to each individual who is arrested on the suspicion of driving under the influence in the District of Columbia. It is unclear exactly what information the Implied Consent Form contains, as there is no copy in the record, but according to Officer Oxenrider-Murphy, the form "gives [arrestees] . . . information," and informs them of "their rights." The District of Columbia Code requires that before police collect specimens for chemical testing from

(continued . . .)

asleep. Various attempts to wake appellant, including "yelling" for "several minutes" and administering a "sternum rub" were unsuccessful. There were fixed cameras located in the cellblock, but the video from the night of appellant's arrest no longer existed on the date of trial.

Appellant's defense at trial focused largely on the government's lack of evidence to prove his guilt beyond a reasonable doubt. Appellant also argued that the government failed to preserve important evidence, such as the vodka bottle recovered from appellant's SUV and video recordings of appellant at the police station from the night appellant was brought to the Fourth District station, in violation of MPD General Orders. Appellant explained his appearance and actions at the scene as the result of having just been injured in a "major [car] accident." It

---

(. . . continued)

persons suspected of driving under the influence, "the law enforcement officer shall advise the operator of the motor vehicle about the requirements [under the law]." D.C. Code § 50-1904.02 (d) (2012 Repl.). District of Columbia law provides that persons arrested on reasonable suspicion of driving while intoxicated who are involved in a collision, "shall submit two specimens for chemical testing of his or her blood, breath, or urine for determining alcohol or drug content," § 50-1904.02 (a)(2), unless the person objects to blood collection on valid religious or medical grounds. § 50-1904.02 (b). An arrestee who refuses to submit to testing must "be informed that failure or refusal to submit to chemical testing" will lead to revocation of the arrestee's driver's license for a period of twelve months. D.C. Code § 50-1905 (a)(1)(A) (2012 Repl.). Moreover, if a person under arrest refuses to submit a specimen for chemical testing and has been previously convicted of driving under the influence of alcohol or a drug, "there shall be a rebuttable presumption that the person is under the influence of alcohol or a drug or any combination thereof." § 50-1905 (b).

was appellant's contention that the responding police officers mistakenly assumed he was intoxicated and took no steps to determine whether appellant was suffering from injuries associated with the car accident.

The jury found appellant guilty of driving under the influence. He filed a timely appeal.

## II. The Government's Obligation to Preserve Discoverable Evidence

We have repeatedly recognized that the "government has a general duty to preserve discoverable evidence under [Superior Court Criminal Rule] 16 (a)(1)(C) and long-established case law." *Williams v. United States*, 77 A.3d 425, 437 (D.C. 2013) (quoting *Bean v. United States*, 17 A.3d 635, 638 (D.C. 2011)).[4] Documents and tangible objects "within the possession, custody or control of the government"[5] are discoverable if "material to the preparation of the defendant's defense." Super. Ct. Crim. R. 16 (a)(1)(C). Under Rule 16 the threshold of materiality "is not a high

---

[4] "In the District of Columbia, the duty to preserve discoverable evidence dates back at least forty years, to the leading case of *United States v. Bryant*, 439 F.2d 642 (D.C. Cir. 1971)." *Myers v. United States*, 15 A.3d 688, 690 (D.C. 2013).

[5] Evidence in the possession of MPD is considered to be within the "custody or control" of the government. *Robinson v. United States*, 825 A.2d 318, 327 (D.C. 2003).

one; the defendant need only establish a reasonable indication that the requested evidence will either lead to other admissible evidence, assist the defendant in the preparation of witnesses or in corroborating testimony, or be useful as impeachment or rebuttal evidence." *Tyer v. United States*, 912 A.2d 1150, 1164 (D.C. 2006) (citation omitted) (internal quotation marks omitted). However, to show that a failure to preserve discoverable evidence that is "potentially useful to the defense" violates due process, appellant must also establish that the government acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (*cited in Williams*, 77 A.3d at 437). Bad faith of constitutional magnitude is shown if the "evidence . . . possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984).[6] The trial court has "considerable discretion in determining 'the degree of negligence or bad faith involved' in the failure to preserve evidence." *Tyer*, 912 A.2d at 1165 (quoting *Battocchi v. Washington Hospital Center*, 581 A.2d 759, 767 (D.C. 1990)). We

---

[6] Where material, exculpatory evidence in the possession of the government is not preserved and disclosed to the defense, the Due Process Clause is violated, regardless of whether the government acted in good faith or bad faith. *See Youngblood*, 488 U.S. at 57 (referring to *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Materiality, for this purpose, means that the missing evidence "would have made a different result reasonably probable." *Kyles v. Whitley*, 514 U.S. 419, 441 (1995).

will disturb the trial court's findings that the government did not act in bad faith or was not grossly negligent only if those findings are "plainly wrong or without facts to support [them]." (*Emanuel S.*) *Davis v. United States*, 641A.2d 484, 494 (D.C. 1994) (alteration in original) (quoting D.C. Code § 17-305 (a) (2012 Repl.)).

When breach of a discovery rule has occurred, the trial court has authority to fashion an appropriate sanction. *See Sheffield v. United States*, 397 A.2d 963, 967 (D.C. 1979) (citing *Cotton v. United States*, 388 A.2d 865, 869 (D.C. 1978)). The imposition of sanctions, however, is not automatic, and the form of sanction imposed "may vary with the degree of culpability found." *Id.* (citing *Cotton*, 388 A.2d at 870). We review the trial court's decision to impose sanctions for abuse of discretion. *Ferguson v. United States*, 866 A.2d 54, 59 (D.C. 2005); *Gethers v. United States*, 684 A.2d 1266, 1272 (D.C. 1996). For sanctions short of dismissal for a due process violation, the trial court weighs three factors: "(1) the degree of [government] negligence or bad faith involved; (2) the importance of the evidence lost; and (3) the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice." *United States v. Day*, 697 A.2d 31, 35 (D.C. 1997) (alteration in original) (quoting *Cotton*, 388 A.2d at 869).

A. *The Defense Request and the  Discovery Violation*


In this case, defense counsel made a discovery request on December 7, 2012, the thirty-fourth day after appellant was arrested on November 2, 2012.  The letter requested tangible evidence that is "material to the preparation of [appellant's] defense or is intended for use by the government in its case in chief or was obtained from or belonged to the [appellant], pursuant to Super. Ct. Crim. R. 16." This request clearly covered the bottle of vodka that officers said was found in appellant's car.   The defense letter also requested video of appellant "at the station."  The government did not produce the bottle or any video because it had not preserved them.


It is evident that a bottle of liquor found in the automobile of a person arrested for DUI is discoverable under Rule 16 (a)(1)(C) because it is "material to the preparation of the defense" and because it "belonged" to the defendant. Similarly, video[7] of a person just arrested for driving under the influence or

---

[7]  Although Rule 16 does not specifically list "video" as a discoverable item, it identifies "recorded statements made by the defendant . . . within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government," Super Ct. Civ. R. 16 (a)(1)(A), and "photographs, tangible objects . . . within the possession, custody or control of the government . . . ."  Super. Ct. Crim. R. 16
(continued . . .)

operating a vehicle while impaired is material in that it may assist in showing whether the person was acting in a way consistent with intoxication or impairment. In this case, our focus is on the request by defense counsel for video recordings of appellant at the station where appellant was taken shortly after he was arrested.[8] In making his argument to the judge for an instruction with a negative inference against the government to be drawn from the spoliation of the video evidence, defense counsel pointed, in particular, to the materiality to the defense of video that would show appellant "walking in straight, without aid of anybody else, without

_____

(. . . continued)
(a)(1)(C). We have little difficulty concluding that a video—a recordation of a succession of images that may or may not be accompanied by audio—comes within the purview of items that are discoverable evidence under Rule 16. *See Myers*, 15 A.3d at 690-91 (video from recording device on bus); *United States v. Henriquez*, 731 F.2d 131, 137 (2d Cir. 1984) ("twenty-four hour continuously running tape recordings" of communications); *United States v. Yevakpor*, 419 F. Supp. 2d 242, 252 (N.D.N.Y. 2006) (video taken during border stop and search); *State v. Allen*, 2008 Me. Super. LEXIS 251 at *7, *10 (Me. 2008) (video of blood alcohol level test conducted at county jail of person arrested on suspicion of DUI); *see also Robinson*, 825 A.2d at 321 (audio recording of telephone call made from prison).

[8] There was testimony at trial (and the jury was instructed) that MPD police stations have video cameras continuously recording both outside and inside the station. Defense counsel's request, however, was not framed in terms of the location of the recording equipment but of its subject. Officer Clifton Murphy testified that there are fixed police cameras in each police station, including the Fourth District station where appellant was taken. He replied affirmatively when asked whether those cameras would capture images of "people being arrested who are brought into the station," "during the booking process," and "from the cellblock."

falling over, falling into the police station."[9]  Such evidence could have been used to counter the officers' testimony that appellant appeared to be intoxicated (walking off-balance, bloodshot eyes, slurring his words, and urinating on himself) at the scene of the car crashes.  Moreover, video taken while appellant was detained in the cellblock was material to the defense in light of the officers' testimony that appellant refused to submit samples for chemical testing and was so unresponsive in the cellblock that he could not be roused—even after the officers yelled at him and rubbed his sternum—for the purpose of reading and signing the Implied Consent Form.  In closing argument and in rebuttal, the prosecutor referred to appellant's refusal to submit to testing and his "deep sleep" in the cellblock as evidence that he was "impaired by alcohol."

Neither the bottle nor any of the station house video, however, was preserved as potentially discoverable evidence. The bottle of vodka found in appellant's car was discarded and it appears that no attempt was made to preserve

---

[9]  Because the video was destroyed there is no way to know whether it would have, in fact, been helpful to the defendant.  Exculpatory value is obviously important in the due process analysis and in the determination of what is an appropriate sanction when evidence is lost or undisclosed.  But it is not determinative of whether evidence is material and therefore discoverable under Rule 16.

it.[10] The video was apparently available for a period of approximately thirty days before it was recorded over, although that appears to have been a result of the technological capability of the recording system rather than any considered effort to preserve discoverable evidence.[11] Government counsel could not say for sure when it was recorded over and whether it had been available when the defense request was received, but it had been destroyed by the time of trial.

We agree with the motions judge that the government's failure to preserve and produce the requested evidence was a discovery violation. The government does not contest that if it had the items, they would have been discoverable. Rather, the government contends it had no obligation to preserve them. With

---

[10] When asked what happened to the bottle of vodka he photographed, Officer Murphy, who was summoned to administer field sobriety tests, testified as follows:

> I—I didn't take it from the vehicle. I took a picture of it. I had left and there were still officers on the scene. We don't usually take bottles of liquor as evidence just because they are liquid and they're perishable items, so. And there's a lot of—in order to—to take evidence that is a liquid, there's a lot of different things you have to do, so it wasn't—you know, it wasn't—I got a picture of it so I didn't think I needed to take it.

[11] Government counsel explained to the trial court that when a particular video is recorded over is not a fixed date, but occurs "as space allows," and that "space typically only allows until that thirty-day point." Thus, according to government counsel, it is possible that the video might be available for a few additional days.

respect to the bottle, the government's argument is that its duty to preserve is limited to evidence "expected to play a significant role in the suspect's defense" or that presented "an exculpatory value that was apparent before the evidence was destroyed," citing *Trombetta*, 467 U.S. at 488. As we have discussed, this is the standard under the Due Process Clause, which is significantly more stringent than the government's discovery obligation under Rule 16's broad test of "materiality" and, in any event, Rule 16 expressly covers an item seized by the government, such as the bottle in this case, that belonged to the defendant. We also disagree with the government's assertion that "an officer might decline to preserve a bottle and its contents because he saw no need to do so, as indeed the officer here seemed to believe." The government's discovery obligations are measured by the standards set out in Rule 16, not the subjective notions of what an individual officer might "seem to believe." See also note 14 *infra*.

With respect to the video, the government's contention is that there is "nothing inherently wrong" with the practice of recording over the video every thirty days and that there existed "every opportunity to request the video sooner." This contention is belied by the record in this case. The defense hand-delivered to the government a specific request for the station house video thirty-four days after appellant was arrested. The request alerted the government to the police department's practice of periodically recording over previously recorded material,

and requested immediate action on the request.[12]  The government, however, did not act on the defense request until shortly before trial, by which time the police department replied that the video was no longer available because it had not been requested "within the thirty-day preservation period."[13]  Thus, it appears that there

---

[12]  The relevant portion of defense counsel's written request stated as follows:

> **I also request a copy of all videos taken of my client. This includes any videos taken of my client at the station.**  Many stations have surveillance cameras that would have captured images of my client. *I request that all such videos be preserved so that I may view them. I will note that many surveillance camera tapes are only kept for a short period of time, so immediate action is necessary to preserve such evidence.*  Unless otherwise informed within ten business days of this letter, I will assume that there are no recorded police communications relevant to this case.

(bolding in original) (italicized emphasis added).

[13]  The trial court commented on the handling of defense discovery requests:

> [W]e have a very busy misdemeanor U.S. Attorney's Office.  I'm not excusing not looking into this, but, you know, these *Rossser* letters don't get read the instant that they come in; and obviously, they don't get studied.  There are a lot of *Rosse*r letters that come with all these cases.
>
> And, for sure, it would have been the right thing to . . . immediately—upon somebody becoming aware of [defense counsel's] request, to take action to do something about it, 'cause I think it was a good request on [defense counsel's] part, in terms of representing your client, and thoughtful in that it would have been good for the government to see

(continued . . .)

is a possibility that the video could have been recovered and turned over to the defense if the government had acted more expeditiously in responding to the request. However, it also appears that in light of the delay in responding to the defense request, the video likely would have been recorded over by the police department even if the request had been made within the police department's thirty-day window. In short, the combination of the police department's practice of recording over video every thirty days or so and the prosecutor's practice in the handling of discovery requests prevented the preservation of discoverable evidence that was promptly requested by the defense.

The record in this case demonstrates that these practices do not align with the government's obligation to preserve evidence to which appellant was entitled. "The Rule 16 duty to disclose includes an obligation to preserve vital evidence within the government's possession before prosecution begins." *Myers*, 15 A.3d at 60. This is not to say that the government has an obligation to preserve every scrap of evidence that could turn out to be material in a case. *Brown v. United States*, 372 A.2d 557, 560 (D.C. 1977). Determining whether there is an obligation to preserve evidence depends on a reasonable expectation that it will fall within the

_____

(. . . continued)

> whether they could find these recordings so that they could produce the tapes. And, unfortunately, that didn't happen.

scope of evidence that is discoverable under Rule 16, *Jencks* or the Constitution's Due Process Clause. That is an assessment that the government needs to undertake, on a systemic basis, taking into account the discovery potential of evidence it routinely collects or captures (whether on video or by other means) and the steps needed to preserve it.

With respect to videos of DUI/OWI arrestees, such as appellant, a determination of their potential as discoverable evidence is fairly straightforward. District of Columbia law creates a presumption of intoxication if a properly informed arrestee refuses to submit to testing. D.C. Code § 50-1905(b); *see supra* note 2. The law expressly provides that evidence of a defendant's refusal to submit samples for chemical testing may be presented to the jury. *See* D.C. Code § 50-1905(c) (2012 Repl.). It is, therefore, to be expected that such evidence will be presented as part of the government's case, as occurred at appellant's trial. Moreover, it is also customary in DUI/OWI cases for the government to present the testimony of officers and other witnesses about their observations of the defendant's appearance, speech and actions as a basis from which to infer intoxication and impairment. Therefore, in the statutory and evidentiary context of DUI/OWI prosecutions, it takes a small, logical step to conclude that video that captures a suspect's appearance, speech or actions soon after arrest and that records when the suspect is being informed of his rights under the statute and asked to

submit to testing will be material to the defense and must be preserved for disclosure. *Cf. State v. Ferguson*, 2 S.W. 3d 912, 917-18 (Tenn. 1999) (holding that state had duty to preserve station house video depicting administration of sobriety tests). In light of the record in this case and the government's arguments on appeal, we are constrained to agree with appellant that, "in analyzing the systemic steps taken to preserve the tapes, it is clear that the consideration of the potential discoverable material therein is nearly nonexistent."

It is for the government to establish procedures and practices to preserve such evidence. Technology and available resources will undoubtedly play a part in the government's determination. However, a reasonable amount of time has to be allowed for the defense to make a discovery request, and for the government to respond to those requests. And it is critical that the police and the prosecutor's practices not be viewed in isolation, but as an integrated system that is capable of responding to reasonably timely defense requests for discoverable evidence.

In this regard, we also note that the practices that have come to light in this case are inconsistent with MPD policy as expressed in two General Orders that were introduced into evidence at appellant's trial. "The policy of the Metropolitan Police Department is to preserve all material, which may constitute evidence, or

may otherwise be pertinent in a subsequent criminal judicial proceeding." MPD General Order 601.2 "Preservation of Potentially Discoverable Material" (Feb. 3, 2004) at Part II. "Policy." Under the MPD's General Order, "potentially discoverable material" is defined to "include[], but is not necessarily limited to, such items as tangible documents, reports, *video/audio tapes*, transcripts of video/audio tapes, and photographs." *Id*. at Part III. "Definitions" (emphasis added). Potentially discoverable evidence is to be preserved "until the entire investigative jacket or case folder is disposed of," or, "[i]f no criminal judicial proceeding has been initiated, the material shall be preserved for a period of three years from the date such material was first obtained." *Id*. at Part V.B (1) & (2). *See also* MPD General Order 304.8 (Apr. 16, 1991) ("Members and/or investigators are reminded that the identification and collection of evidence should be a team effort, and that no item of evidence should be overlooked.").[14] In sum, had the existing MPD policies been followed, the evidence requested by counsel should have been available for appellant's defense. The problem is not with the

---

[14] We note that there is no exception in these General Orders for liquids. Moreover, General Order 601.01 requires recordation of "all property that comes into the custody of a member of the department." General Order 601.01, Part I.B. ("PD Form 82-Property Book") & Part I.C. ("PD Form 81 – Property Record"). It provides for separate recordation and packaging of full bottles of alcohol depending on whether the seal is intact or missing/broken. *Id*. at Part I.D. ("Special Instructions"). Property taken at the time of arrest that is evidence of a crime is to be so identified in the Property Book, kept separate from other property taken from the arrestee, and marked "in a manner that does not deface or alter its appearance." *Id*. at Part III.F. ("Evidence and Suspected Proceeds of Crime").

MPD's policy on preservation of discoverable evidence, but with its non-implementation.

Even though the government failed in its obligation to preserve and produce the requested video and liquor bottle, as we explain in the next section, we conclude that there was no due process violation and that the trial judge did not abuse discretion in its choice of sanction for a discovery violation. That the destruction of evidence in this case was not intended to thwart defense requests may suffice, as we hold *infra*, to support a finding that the government did not act in bad faith. But once the government is on notice of its obligations with respect to foreseeably discoverable items of evidence in DUI/OWI cases that are likely to be in its possession, and aware of the negative impact that current practices have on its ability to satisfy those obligations, lack of "willfulness" ceases to be a defense to sanction for failure to preserve discoverable evidence. *See Robinson*, 825 A.2d at 332 (upholding trial court sanction for non-preservation of tape recording where "government was afforded the opportunity but failed to carry its 'heavy burden' to explain the failure to secure and preserve the tape recording so it could comply with its duty of disclosure"); *Henriquez*, 731 F.2d at 137-38 (noting, with respect to Coast Guard's routine erasure for reuse of "twenty-four hour continuously running tape recordings" of communications, that the court "will look with an exceedingly jaundiced eye upon future efforts to justify non-production of a Rule

16 or Jencks Act statement by reference to 'department policy' or 'established practice' or anything of the like" and that "sanctions will normally follow" where destruction is deliberate "unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant").

### B. Sanction for Discovery Violations

#### 1. The Video at the Police Station

Appellant's argument concerning the video is two-fold: (1) the government's failure to preserve discoverable evidence in the form of video of his time in the police station violated his due process protections; and (2) the trial court's choice of sanction levied on the government for its failure was an abuse of discretion.

Before trial, the defense sought to dismiss the case due to the government's failure to preserve and produce the video. The motions judge found that the video recording of appellant while he was detained at the police station was material to the defense and was therefore discoverable under Rule 16, but that the government's failure to preserve and produce the video was not the result of bad faith, as there was no "willful refusal" to preserve the requested evidence. Thus, although the judge found that the government's failure to turn over the video was a

discovery violation, dismissal was "too drastic a remedy." The court's finding that the government did not act in bad faith in this case is not plainly wrong, and is supported by sufficient evidence in the record of what appears to have been routine (even if ill-considered) practices. As there was no bad faith on the part of the government, appellant's right to due process was not violated and dismissal was not required. *See Youngblood*, 488 U.S. at 58.

Our inquiry continues, as appellant argues that the sanction levied on the government by the trial court for the discovery violation was inadequate and constitutes an abuse of discretion. In this case, the trial court denied appellant's request to instruct the jury to infer that the destroyed video supported appellant's defense that he was not intoxicated. Instead, the trial court instructed the jury that a request for video from the station was made, but the video had been destroyed in accordance with MPD practice to record over video after thirty days, leaving it to the jury to draw its own conclusions.[15]

---

[15] The trial court gave the following instruction:

> As you have heard, videotapes are continuously recorded outside and inside the Fourth District station.
>
> According to the government, these videotapes are recorded over approximately 30 days after they are first

(continued . . .)

We conclude that the trial court did not abuse discretion in its choice of sanction. The "range of available sanctions is extremely broad, the only real limitation being that a sanction must be 'just under the circumstances.'" *Gethers*, 684 A.2d at 1272 (quoting (*Angel*) *Davis v. United States*, 623 A.2d 601, 605 (D.C. 1993)). The trial court considered evidence that the police department had in place a practice that could lead to the destruction of video evidence after a thirty-day period, and that the government could not determine whether the video taken on the night appellant was arrested had actually been recorded over at the time it was requested by defense counsel. The court also took note of the fact that defense counsel had acted expeditiously in making a specific request for video in a *Rosser*

---

(. . . continued)

> recorded. The videotapes are not recorded over until at least after 30 days.
>
> The defendant was arrested on November 2nd, 2012 and taken to the Fourth District station. On December 7, 2012, defense counsel delivered to the Office of the Attorney General for the District of Columbia a discovery letter that included within it a request that the videotape at the Fourth District station from November 2nd, 2012 be preserved. The videotape from November 2nd, 2012 no longer exists and has not been viewed by any counsel. There is no information about exactly when the videotape from November 2nd, 2012 was recorded over. You may consider these facts and give them whatever significance you deem appropriate in determining whether the government has proved its case beyond a reasonable doubt.

letter, and had alerted the government to the need for prompt attention, but that the government delayed acting on the request until shortly before trial, several months after the request was received.[16] Such actions, the trial court found, were negligent, but the lack of a "willful act" by the government to deny the requested items of evidence to the defense persuaded the court that a negative inference against the government was not warranted. Importantly, the trial court also considered that other facts in evidence—the officers' testimony of what they observed and audio of the 911 call that captured appellant's voice—permitted the jury to conclude that the destroyed video footage would not support appellant's defense.

The trial court's instruction conveyed objective, impartial information about what had occurred and permitted the jury to "consider these facts and give them whatever significance [the jury] deem[s] appropriate in determining whether the government has proved its case beyond a reasonable doubt." Given the trial court's finding that the government's failure to meet discovery obligations with respect to the video, though negligent, was not willful, and the other evidence in

---

[16] As the trial court observed, "[t]he fact is that a request was made. It's possible that this videotape was still in existence at that time or soon thereafter, and because nobody did anything to preserve it, it doesn't exist now."

the case, we conclude that the sanction imposed by the trial court was "just under the circumstances." *Gethers*, 684 A.2d at 1272 (citation omitted).

### *C. The Liquor Bottle.*

Appellant contends that the trial court abused its discretion when it declined to sanction the government for failing to preserve the vodka bottle officers claimed to have found in appellant's car. Appellant sought sanction in the form of suppression of the photographs taken of the bottle which showed that the seal was broken and the bottle was ninety-percent full.

Testimony at trial established that police officers found a bottle of Grey Goose vodka on the floor of appellant's car, with the seal broken. Officer Murphy photographed the bottle, but did not preserve the bottle itself; instead, he just "threw it out." Although the act of discarding the bottle itself was deliberate, the record does not support that the police acted in bad faith, for the purpose of preventing appellant from examining the bottle and its contents or making evidentiary use of the bottle at trial. *See Bean*, 17 A.3d at 638 (holding, on plain error review, that failure to preserve the bottle of alcohol did not violate defendant's due process rights in prosecution for possession of an open container of alcohol when nothing in the record suggested bad faith on the part of the police);

*see also Cantizano v. United States*, 614 A.2d 870, 873 (D.C. 1992) (no bad faith when a police officer told an assault victim she could dispose of a paper towel used to wipe off substance defendant smeared on her face). Rather, as government counsel stated at trial, the officers "didn't think about it" and the bottle was not kept or listed on the police property books.

Furthermore, while the discovery of the liquor bottle in appellant's car corroborated other evidence presented by the government, it was not central to the government's proof. The case turned on whether appellant was intoxicated, not on whether he had an open container of liquor in his car. *Cf. Workman v. United States*, 96 A.3d 678, 681-82 (D.C. 2014) (reversing conviction for possession of open container of alcohol for insufficient evidence where only photographs of a tequila bottle in defendant's car were admitted into evidence to support government's case but police failed to secure bottle or testify as to its contents). In addition to photographs of the bottle, the government presented independent, substantial evidence of appellant's intoxication. The jury heard testimony from multiple police officers, from a citizen-responder, and appellant's own voice in the background of a 9-1-1 call, about the multi-car accident and appellant's condition to support a finding that appellant had driven his car while intoxicated. Thus we do not believe that the "ends of justice" would be served by remanding for a new trial without the photographs as a sanction for the failure to preserve the bottle of

vodka. *Day*, 697 A.2d at 36. Appellant has given no reason "to conclude that the availability of the [vodka] bottle would have made any difference in the outcome" of the trial. *Bean*, 17 A.3d at 638.[17] Applying the standard established in *Cotton*, the trial court did not abuse its discretion in declining to suppress photographs of the bottle of vodka as a sanction for the destruction of the bottle itself. 388 A.2d at 869.

We also hold that the trial court did not abuse discretion when it admitted photographs of the vodka bottle into evidence. *See Strozier v. United States*, 991 A.2d 778, 783-84 (D.C. 2010). The jury heard the testimony of two officers who saw the bottle in appellant's car, and was made aware that the officers did not test its contents and discarded the bottle. The jury was also informed that the officers were familiar with two General Orders of the MPD which call for the prompt identification and collection of evidence and the preservation of discoverable evidence. On this record and in light of the purely corroborative evidentiary value in this case of the presence of the vodka bottle in appellant's car, we see no reason

---

[17] Appellant did not testify. Thus, there was no evidence to question that the bottle's contents were anything other than what the label indicated. To the contrary, other evidence supported that the bottle was filled with vodka. Officers testified that there was also a bottle of cranberry juice in appellant's car, which, the jury could find, was meant as a mixer for the vodka. Appellant told the officers at the scene that "it was his birthday and his girlfriend was with him and that she wouldn't come along."

to upset the trial court's implicit determination that the danger of unfair prejudice did not substantially outweigh the photographs' probative value.

### III. Criminal Jury Instruction No. 6.401 DUI-Refusal

Appellant's final argument is that the trial court erred when it gave a jury instruction for "DUI refusal," because appellant "never gave knowing, voluntary, and informed refusal to blood or chemical tests." "Where an objection to a jury instruction was preserved at trial, we review the trial court's decision to give the instruction for abuse of discretion." *Headspeth v. United States*, 86 A.3d 559, 565 (D.C. 2014) (citing *Wheeler v. United States*, 930 A.2d 232, 238 (D.C. 2007)). The "central question for this court is whether [the instruction] is an adequate statement of the law, and whether it is supported by evidence in the case." *Wheeler*, 930 A.2d at 238.[18]

The trial court informed counsel for both parties that it would give the "instruction on DUI refusal [as it] appears in the red book," and, as the defense had

---

[18] The government argues that this claim is waived under the "invited error" doctrine because defense counsel "agreed" with the trial court's proposed course of action. Appellant contends, however, that defense counsel's agreement was to the court's decision not to instruct the jury about the statutory rebuttable presumption, but not to the instruction itself. We need not resolve counsel's disagreement, nor need we apply plain error review, for we perceive no error at all.

requested, did not instruct the jury about the rebuttable presumption created by D.C. Code § 50-1905 (b). *See supra* note 2.

Under D.C. Code § 50-1905 (c), an arrestee's refusal to submit specimens for chemical testing is admissible in a proceeding "arising as a result of the acts alleged to have been committed by the person before the arrest." Thus, Criminal Jury Instruction for the District of Columbia, No. 6.401 (5th ed. Rev. 2013), is appropriate when the jury has heard evidence that the defendant was asked to submit specimens for chemical testing and "may have refused to do so." That is the instruction that was given in this case.[19]

---

[19] The trial court instructed as follows:

> You have heard evidence that het defendant, at the time of his arrest, was asked to submit to chemical testing of his blood, urine or breath for the purpose of determining blood alcohol content and may have refused to do so. It is up to you to decide whether [there was] such a request and whether he refused to obey that request.

> If you find that he did refuse to submit to a request for chemical testing, you may consider his refusal as tending to show his feelings of guilt, which you may, in turn, consider as tending to show actual guilt. On the other hand, you may also consider that he may have refused for reasons that are fully consistent with innocence in this case. If you find that the defendant refused to submit to chemical testing, you should give the evidence as much weight as in your judgment it deserves.

The government presented evidence that appellant refused to submit specimens for testing. There was testimony at trial that after appellant was arrested, he was placed in a holding cell, and Officer Oxenrider-Murphy asked appellant if he was willing to provide a sample of his urine. Appellant "stated he wasn't." Officer Oxenrider-Murphy then "asked if [appellant] was choosing to refuse because he stated that he wasn't going to do any of it." Appellant then "stated he refused." Officer Oxenrider-Murphy left appellant to retrieve the Implied Consent Form, which gives arrested individuals notice of "their rights" and "information." When the officer returned to the holding cell, appellant "was asleep." Officer Oxenrider-Murphy "called for several minutes, trying loudly to wake him up." When appellant did not respond, Officer Oxenrider-Murphy was assisted by Officer Hampton, who "went in and actually gave [appellant] a sternum rub, to try and wake him up." Appellant woke briefly, and "proceeded back to sleep." Appellant's argument that he did not refuse to submit specimens for testing because he did not actually sign the Implied Consent Form is unavailing. Officer Oxenrider-Murphy's testimony provided a sufficient basis from which the jury could find that appellant refused to submit samples for chemical testing. Moreover, the government put forward substantive evidence that appellant's lack of responsiveness when the officers attempted to present the form to him for signature was due to voluntary intoxication. We have held that one may not utilize alcohol to achieve a state of voluntary unconsciousness, and then rely on lack of

consciousness as a basis for avoiding chemical or blood tests. *See District of Columbia v. Olney*, 399 A.2d 84, 86 (D.C. 1979).

The instruction that was given did not direct the jury to infer that appellant had, in fact, refused. Rather, it reflected that the government had presented some evidence suggesting that appellant had refused to submit specimens for chemical testing. It permitted, but did not mandate, the jury to make reasonable inferences if it found that a request was made and that appellant had refused to submit to testing. Based on the evidence presented at trial, the trial court did not abuse its discretion when it gave jury instruction No. 6.401.

In sum, for the foregoing reasons we hold that there was no abuse of discretion or error requiring reversal of appellant's DUI conviction.

The judgment of the trial court is

*Affirmed.*

MCLEESE, *Associate Judge*, concurring in the judgment: I agree that the trial court did not abuse its discretion in responding to the government's failure to

produce in discovery (1) a liquor bottle that officers testified they found in the car Mr. Koonce had been driving; and (2) police-station video that may have depicted Mr. Koonce's condition after Mr. Koonce was arrested. I also agree that the trial court did not abuse its discretion in instructing the jury about Mr. Koonce's refusal to submit samples for chemical testing. I therefore concur in the judgment. I write separately, however, because I cannot join the court's discussion of the question whether the police had a duty to preserve the police-station video.

My reservations about the court's discussion of that question are in large part procedural. First, the discussion is unnecessary to the resolution of the appeal, given the court's holding that the trial court did not abuse its discretion in selecting the appropriate sanction for any discovery violations. Second, the parties have not briefed the question whether the government had a duty to preserve the police-station video. Rather, they essentially take as a given the trial court's finding of a discovery violation. Third, whether, and if so in what circumstances, the government has a duty under Rule 16 of the Superior Court Rules of Criminal Procedure to preserve police-station surveillance video is a question of first impression in this court, and the opinion for the court in this case does not cite pertinent authority from other jurisdictions addressing the question. Fourth, as I briefly explain *infra*, the question seems to me more difficult than is reflected in the opinion of the court. Well settled principles argue against deciding difficult

questions of first impression that are unbriefed and unnecessary to the disposition of the case. *See, e.g.*, *National Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, ___, 131 S. Ct. 746, 756 n.10 (2011) ("It is undesirable for us to decide a matter of this importance in a case in which we do not have the benefit of briefing by the parties . . . ."); *Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581, 592 n.5 (1993) (dicta that are "uninvited, unargued, and unnecessary to the Court's holdings" are inconsistent with doctrine of judicial restraint); *United States v. Adams*, 740 F.3d 40, 43 (1st Cir.) ("This prudential approach makes eminently good sense: . . . [d]iscretion is often the better part of valor, and courts should not rush to decide unsettled legal issues that can easily be avoided.") (internal quotation marks omitted; brackets in *Adams*), *cert. denied*, 134 S. Ct. 2739 (2014); *Crown EMAK Partners, LLC v. Kurz*, 992 A.2d 377, 398 (Del. 2010) ("[I]t is unnecessary for this Court to decide that issue, because a decision either way would not alter the result we have reached nor would a gratuitous statutory interpretation resolving this difficult issue be prudent.").

Given the foregoing, I am not inclined to add extended dicta of my own about whether the police violated a duty to preserve video evidence in this case. I do, however, have three brief observations. First, I tentatively agree with the court's suggestion that whether the police have a duty under Rule 16 to preserve a given item of potential evidence turns on whether, at the relevant time, the police

reasonably should have appreciated a sufficient likelihood that the item would be discoverable in a prosecution. *Cf. Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (assessing due-process claim, Court refuses to "impos[e] on the police an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution[,]" and instead adopting standard that "limits the extent of the police's obligation to preserve evidence to reasonable bounds"); *California v. Trombetta*, 467 U.S. 479, 489 (1984) (under Due Process Clause, duty to preserve evidence does not arise unless evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed"); *Gerlich v. United States Dep't of Justice*, 404 U.S. App. D.C. 256, 265-66, 711 F.3d 161, 170-72 (2013) (in civil litigation, party has duty to preserve records "likely relevant" to reasonably foreseeable future litigation). My views on this point are tentative, however, because the parties have not briefed the point, the court in this case does not cite pertinent authority, and my quick search has not located clear authority on the point from this court or other courts.

Second, assuming that the duty to preserve an item turns on whether the police should reasonably have appreciated a sufficient likelihood that the item would be discoverable, the issue then becomes what degree of likelihood is sufficient. The parties have not briefed that issue, the court in this case does not

cite pertinent authority on the issue, and my quick search has not shed meaningful light on the issue.

Third, assuming that we knew what degree of likelihood is sufficient, the next issue would be whether the police should reasonably have understood that police-station video in this case was sufficiently likely to be discoverable. I have reservations about both the legal and the factual aspects of the court's brief discussion of that issue. On the legal side, the court relies primarily on a case involving police-station video depicting officers administering a field-sobriety test. *State v. Ferguson*, 2 S.W.3d 912, 917-18 (Tenn. 1999). It seems obvious, however, that the police should realize the need to preserve video depicting a police-administered test directed at creating evidence of guilt or innocence. It seems less obvious whether, and if so in what circumstances, the police should reasonably be expected to appreciate the need to preserve general police-station surveillance video. The parties have not briefed that issue, the court does not cite any case addressing the issue, and my quick search has not uncovered any such case. On the factual side, the court's discussion appears to imply that the unpreserved video would have depicted Mr. Koonce walking into the police station, refusing to submit samples for chemical testing, and lying unresponsive in the cellblock. In fact, the record on this point consists only of general testimony that there are cameras in the pertinent police station that capture images of

defendants being brought into the station, images during the booking process, and images from the cellblock. There was no testimony about how comprehensive the cameras' coverage might be or what specifically would likely have been depicted in this case. And given the absence of an indication that sound was recorded, it is not clear that police-station video would in any event have shed light on whether Mr. Koonce refused to submit samples for chemical testing.

In sum, the court's opinion unnecessarily addresses in dicta an important question of first impression, without the benefit of briefing by the parties. I also have substantial reservations about the court's discussion of the question. I therefore respectfully concur only in the judgment.