*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CM-325

ULRICK ULCENAT, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(DVM-1627-16)

(Hon. Judith A. Smith, Trial Judge)

(Submitted October 2, 2019                    Decided October 7, 2021)

*Montrell L. Scaife* was on the brief for appellant.

*Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, *Janani Iyengar*, and *Michael J. Romano*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, BECKWITH, *Associate Judge*, and RUIZ, *Senior Judge*.

BECKWITH, *Associate Judge*: Appellant Ulrick Ulcenat was charged with assault and two counts of misdemeanor sexual abuse[1] following a confrontation with

---

[1] D.C. Code § 22-404 (2019 Repl.); D.C. Code § 22-3006 (2019 Repl.).

his former girlfriend. In the course of prosecuting Mr. Ulcenat, the government violated its discovery obligations under the Jencks Act,[2] Super. Ct. Crim. R. 16 (Rule 16), and *Brady v. Maryland.*[3] The trial court sanctioned the government for these violations by drawing all inferences against the government as to the complainant's testimony — a sanction that resulted in Mr. Ulcenat's acquittal on the sexual abuse charges, which depended entirely on her testimony. The court convicted Mr. Ulcenat of simple assault based primarily upon a surveillance video that, in the court's view, completely corroborated the complainant's account of that charge. On appeal from his conviction, Mr. Ulcenat argues that the court's sanction for the government's discovery violations was insufficiently punitive. We perceive no abuse of discretion in the trial court's choice of sanction.

## I.

Ivory Smith, the complainant and sole government witness in this case, testified on direct examination that Mr. Ulcenat assaulted her in the lobby of her apartment building and, after having convinced her to let him into her apartment, forced her to engage in sexual acts without her consent. The government also

---

[2] 18 U.S.C. § 3500 (2012); *see also Jencks v. United States*, 353 U.S. 657, 672 (1957).

[3] 373 U.S. 83, 87 (1963).

introduced video footage of the incident, which showed Mr. Ulcenat carrying and dragging Ms. Smith toward an elevator in the lobby of her apartment building while she tried to get free.

During Ms. Smith's cross-examination, Mr. Ulcenat learned for the first time that Ms. Smith had communicated "[p]lenty of times" with a Metropolitan Police Department detective about MPD's investigation in the case. Ms. Smith revealed through the course of a Jencks inquiry that Detective Timothy Francis had texted her about the case when he "needed information," that she left voicemails for him, and that she emailed him to provide documents pertaining to the case. Mr. Ulcenat, who had requested all discoverable materials more than a year before the start of trial, immediately asked the government to turn over any outstanding Jencks Act material. In response, the government provided (1) an MPD lieutenant's email to Detective Francis informing him that Ms. Smith had called about the case and (2) a screenshot of a cancelled Uber trip to Mr. Ulcenat's address that Ms. Smith sent Detective Francis from her phone.[4] The government further disclosed that Detective Francis did not have any voicemails or text messages from Ms. Smith on his phone and that,

---

[4] Ms. Smith had stated in a videotaped interview with Detective Francis that she should have sent Mr. Ulcenat home in an Uber but that she did not think about it while he was there.

according to the detective, "the voicemails she left were not substantive and only asked the detective to contact her."

In light of these developments, Mr. Ulcenat moved to dismiss all of the charges based on the government's violations of the Jencks Act and *Brady v. Maryland*. The following week the trial court held a hearing at which Detective Francis testified that he had received voicemails and texts from Ms. Smith and had deleted those communications. He could not remember how many messages he received — he could not say whether there were more than five text messages, for example, but he guessed there was "more than one." He acknowledged in his testimony that he had been trained on the procedures for preserving and disclosing Jencks material, *Brady* information, and other discoverable evidence.

At another hearing the following week, the government disclosed records from Ms. Smith's cell phone that it had subpoenaed. The records showed that Ms. Smith had sent Detective Francis forty-six text messages and that Detective Francis had sent her fifty-one text messages. Ms. Smith had made sixty-six phone calls to the detective, thirty-nine of which were between ten seconds and one minute long, which the prosecutor said was consistent with a voicemail. The records further showed that Ms. Smith had made thirty-eight calls to other numbers affiliated with

MPD, eleven of which were between ten seconds and one minute long. A forensic search of Detective Francis's cell phone revealed only eighteen messages from the detective to Ms. Smith and twelve messages from Ms. Smith to him, the substance of which could not be recovered. The government also turned over ten new emails from the detective's phone that were related to the case. Stating "that it's looking like it was more than just scheduling and there was arguably substance" and noting the large number of text messages and phone calls and the length of the calls, the prosecutor conceded a Jencks violation.

Yet more discovery was provided to Mr. Ulcenat over the following month. This discovery included, among other things, a seventy-two-page police report that included twenty-four pages not previously disclosed. The government also disclosed some redacted phone records from the ten months prior to trial showing eight additional calls that Ms. Smith had made to numbers affiliated with MPD. In addition, the government turned over four emails that a Victim Specialist sent to Ms. Smith about the case and a number of emails among MPD officials regarding Mr. Ulcenat's alleged violation of a stay-away order. Mr. Ulcenat again moved to dismiss or, in the alternative, to strike Ms. Smith's testimony for violations of the Jencks Act, *Brady v. Maryland*, and Rule 16.

The trial court ruled that the government violated the Jencks Act, Rule 16, and *Brady*. The court stated that it was concerned about Detective Francis's failure to preserve his communications with Ms. Smith and noted that his inability to recall the substance of those conversations "points to the exact reason" for preserving them. The trial court further questioned what it characterized as a United States Attorney's Office "policy" of asking only the detective — and not the complainant herself — whether the complainant had discussed the case with the detective. Determining that dismissing the case or striking Ms. Smith's testimony would be "too severe" a sanction, however, the trial court decided to disallow any redirect examination by the government and to "draw all inferences against the [g]overnment" with respect to Ms. Smith's testimony.

The trial resumed, and at the close of the government's case, the trial court granted Mr. Ulcenat's motion for judgment of acquittal as to the two counts of sexual abuse. The court based its ruling on inconsistencies in Ms. Smith's retelling of the confrontation as well as the adverse inference the court drew from that conflicting testimony. The trial court subsequently found Mr. Ulcenat guilty of simple assault, finding that the lobby surveillance footage overcame the effect of the adverse inferences.

## II.

When the government violates a discovery rule, the trial court has authority to "fashion an appropriate sanction," *Koonce v. District of Columbia*, 111 A.3d 1009, 1014 (D.C. 2015), and we review the trial court's choice of sanction for abuse of discretion. *Medina v. United States*, 61 A.3d 637, 643 (D.C. 2013) (Jencks Act); *Wiggins v. United States*, 521 A.2d 1146, 1148 (D.C. 1987) (Rule 16); *Johnson v. United States*, 136 A.3d 74, 85 (D.C. 2016) (*Brady*). In this case, Mr. Ulcenat contends that the adverse-inference sanction the trial court imposed for the government's violation of its discovery obligations was not "sufficiently punitive" under the circumstances.[5]

### A.    Jencks Act and Rule 16

The Jencks Act provides that, "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b) (2012); *see also* D.C. Super. Ct. Crim. R. 26.2. And

---

[5] Mr. Ulcenat's motion to late file his reply brief, which was not ruled upon at the time it was filed, is granted.

under Rule 16, "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense . . . [or] the government intends to use the item in its case-in-chief at trial." Super. Ct. Crim. R. 16(a)(1)(E).

A Jencks Act or Rule 16 violation "does not automatically require the imposition of sanctions." *McGriff v. United States*, 705 A.2d 282, 287 (D.C. 1997) (quoting *Slye v. United States*, 602 A.2d 135, 138 (D.C. 1992)). Both the Jencks Act and Rule 16 give the trial court the discretion to fashion a sanction that "serve[s] the end of justice," and in determining the appropriate sanction the court should consider: "(1) the degree of government negligence or bad faith involved; (2) the importance of the evidence lost; and (3) the evidence of guilt adduced at trial." *Koonce*, 111 A.3d at 1014 (cleaned up) (quoting *United States v. Day*, 697 A.2d 31, 35 (D.C. 1997)); *see also Fadul v. District of Columbia*, 106 A.3d 1093, 1097 (D.C. 2015).

Mr. Ulcenat argues that the trial court in this case did not take into account the "astounding" degree of negligence on the part of the government. The record

suggests otherwise. Although the court did not make an explicit finding that the government's discovery violations amounted to bad faith or gross negligence, the court's comments — its concern over Detective Francis's decision to delete so many text messages and voicemails and its uneasiness over what it perceived to be a USAO "policy" to ask only the detective, and not the complainant, about the existence of Jencks materials — indicated its full awareness of the degree of government fault. The sheer amount of discoverable material that the government did not turn over until long after the start of trial and over a year after Mr. Ulcenat's discovery request, including the slew of disclosures it made several weeks after the trial was halted, reinforces our perception that the trial court was cognizant of, and took account of, the negligence underlying the government's conduct.

In the face of the government's conduct, the trial court's sanction was by no means trivial: as applied to the government's only witness, the adverse inference functioned as a de facto dismissal of the two sexual abuse charges that could not withstand a motion for judgment of acquittal with the inference in play.[6] As for the

---

[6] Given the seriousness of the violations, the court conceivably could have stricken the complainant's testimony in full, but the trial court has discretion to fashion an appropriate sanction, and the sanction it chose here was not an abuse of discretion. *See United States v. Bundy*, 472 F.2d 1266, 1269 (D.C. Cir. 1972) (Leventhal, J., concurring).

simple assault, the trial court had a reasonable basis for concluding that the government's additional evidence of guilt on this count — surveillance video that clearly established the elements of the offense independently of the complainant's testimony and rebutted the defense of consent — corroborated the complainant's account and outweighed the need to further sanction the government. The court's choice of sanction was an appropriate exercise of the court's discretion in the context of the egregious violations in this case.

### B. *Brady* Material

Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The government's adherence to the requirements of *Brady* is vital to ensuring that criminal trials are fair. *See generally Vaughn v. United States*, 93 A.3d 1237, 1253 (D.C. 2014). When a prosecutor does not comply with her *Brady* obligations, the trial court has "broad discretion to fashion 'appropriate remedial sanctions,'" as long as the sanction is "just under the circumstances." *Johnson v. United States*, 136 A.3d at 86 n.33 (quoting *Odom v. United States*, 930 A.2d 157, 158–59 (D.C. 2007)). For the sanction to be just, it must take into account both the sanction's effectiveness and the impact of the

violation on the fairness and integrity of trial more broadly. *Id.*

The government's failure to turn over certain impeachment information, particularly the screenshot of the cancelled Uber ride that Ms. Smith emailed Detective Francis, ran afoul of *Brady*, and the trial court so ruled. But a failure to comply with *Brady* does not call for dismissal in every circumstance. *See, e.g., Koonce*, 111 A.3d at 1019. The trial court recognized the need to impose an effective sanction that would remedy the unfairness of the violation. The adverse inference led directly to Mr. Ulcenat's acquittal on the two sexual abuse charges, and the late disclosure of *Brady* information did not prevent Mr. Ulcenat from impeaching Ms. Smith on the basis of the cancelled Uber ride.[7] To the extent that Mr. Ulcenat was unable to impeach Ms. Smith with inconsistent statements that she may have made in the deleted voicemails and text messages, this did not affect the overall fairness of his trial, as the conviction for simple assault rested largely upon video footage of Mr. Ulcenat committing the assault that, again, fully corroborated Ms. Smith's testimony. Under these circumstances, the court did not abuse its discretion in deciding to draw an adverse inference against the government as to Ms. Smith's testimony rather than to dismiss the case or strike her testimony.

---

[7] The trial court also took steps to ensure that Mr. Ulcenat had adequate time to investigate the government's late disclosures.

**III.**

For the foregoing reasons, we affirm the judgment of the Superior Court.

*So ordered.*