*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-611

COREY D. ASKEW, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-17286-13)

(Hon. Frederick H. Weisberg, Trial Judge)

(Submitted May 17, 2019                    Decided July 2, 2020)

*Jesse I. Winograd* was on the brief for appellant.

*Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *Chrisellen Kolb*, and *Elizabeth H. Danello*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN, EASTERLY, and MCLEESE, *Associate Judges*.

EASTERLY, *Associate Judge*: Corey D. Askew appeals from his convictions of four counts of misdemeanor assault on a police officer. D.C. Code § 22-405(b) (2012 Repl. & 2019 Supp.) In this opinion, we initially address Mr. Askew's nonmeritorious arguments and then focus on the scope of the government's

obligation to preserve evidence under Super. Ct. Crim. R. 16 ("Rule 16"). We ultimately conclude that we must remand the record before we can resolve Mr. Askew's claim that the government's breach of this duty requires reversal of his convictions.

## I. Facts and Procedural History

On the evening of September 27, 2013, Mr. Askew was driving southbound on Georgia Avenue N.W. when he was pulled over by Metropolitan Police Department ("MPD") officers because his car's lights were not functioning.[1] Based on computer information indicating that Mr. Askew's license was suspended, the officers sought to arrest him. A physical altercation involving four officers ensued, during which Mr. Askew and the four officers were injured. Mr. Askew was ultimately handcuffed and brought to the police station. The next day, Mr. Askew was charged with one count of felony assault on a police officer ("APO") in violation of D.C. Code § 22-405(c) (2019 Supp.), and at his presentment, defense counsel requested that the government fulfill its preservation

---

[1] The officers had different recollections as to whether the car's headlights, taillights, or both were malfunctioning and were cross-examined on this point.

and disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and Rule 16.

Mr. Askew was subsequently indicted in June 2014 and charged with two counts of felony APO and two counts of misdemeanor APO, D.C. Code § 22-405(b)–(c), each count applying to a different involved officer. In July 2014, defense counsel sent the government a "Rosser" letter[2] memorializing the discovery he had received to date. In that letter, counsel renewed the request that the government comply with its obligations under *Brady v. Maryland* and Rule 16, specifically referencing "photographs and videos" and "reports of any medical treatment." In addition, counsel reminded the government of its "duty to preserve any evidence that is discoverable," citing case law from this court for the proposition that "[t]he duty to produce discoverable evidence entails the antecedent duty to preserve that evidence."[3]

For reasons not relevant to this appeal, prosecution of Mr. Askew's case was delayed, and in May 2016 the government dismissed the indicted charges and re-

---

[2] *Rosser v. United States*, 381 A.2d 598 (D.C. 1977).

[3] *Allen v. United States*, 649 A.2d 548, 553 (D.C. 1994) (citing *Brown (Bradford) v. United States*, 372 A.2d 557, 560 (D.C. 1977)).

charged Mr. Askew by information with four counts of misdemeanor APO in violation of D.C. Code § 22-405(b).

In April 2016, Mr. Askew's new counsel wrote the government "to memorialize [his] understanding of the government's disclosures thus far and to reiterate prior disclosure requests made on Mr. Askew's behalf, including those made at presentment, in [his] predecessor[] [counsel's] *Rosser* letters, and at [their] status hearings." Defense counsel acknowledged receipt of four pages of medical records for one officer, Officer Jimenez, and requested "[a]ny other medical records" for the officers "generated as the result of this alleged incident." With respect to the outstanding request for video footage, counsel noted that "as MPD is aware, multiple government cameras cover the area in which this incident took place," and, "[a]s you also know, government cameras loop over and delete footage if not properly preserved, often within as short [a time] as 10 days." Counsel reminded the government of its "obligation under Rule 16 and the Constitution to preserve such footage," again citing this court's case law.[4]

---

[4] Counsel again cited to *Allen*, 649 A.2d 548, and also cited to this court's decision in *Koonce v. District of Columbia*, 111 A.3d 1009 (D.C. 2015).

In November 2016, defense counsel filed a "motion for sanctions for failure to preserve and produce evidence." Counsel asserted that (1) at the time of Mr. Askew's arrest, "MPD was operating two crime cameras less than a block away" that "would have captured Mr. Askew's vehicle driving on Georgia Avenue (the condition of which [was] the purported reason for the stop of the vehicle), as well as the interaction between Mr. Askew and the involved officers (which [was] the basis for the charges against Mr. Askew)," and (2) when "Mr. Askew was taken to the stationhouse that evening[,] [h]e walked past several cameras in the stationhouse that would [have] captured his gait, his interaction with [the] officers, his injuries, and his injuries' impact on his ability to walk." Counsel stated that he had received no video footage from any of these cameras, that "MPD knew or should have k[n]own of the existence of the MPD video footage and accordingly should have taken steps to preserve it," and that "the government's failure to preserve these critical recordings amount[ed] to a violation of Rule 16." As a sanction, counsel asked either for the charges against Mr. Askew to be dismissed or for an opportunity to be heard on lesser remedies.

In response to Mr. Askew's motion, the government stated that it did "not have th[e] videos" from the Closed Circuit Television (CCTV) cameras in the vicinity of Mr. Askew's arrest and further argued that it "never had reason to

preserve them" because the videos were "immaterial." The government proffered that the CCTV cameras would not have captured any footage of the condition of Mr. Askew's car lights or the events of the traffic stop because one was a stationary, south-facing camera located south of where Mr. Askew was stopped while driving southbound on Georgia Avenue, and the other was a rotating camera that could have potentially pointed towards Mr. Askew and his car but was more than 400 feet away and thus "out of [] range" from the location of the stop. Contemplating that the court could require it to provide evidentiary support for its proffer, the government stated that it had "an MPD officer familiar with the camera system to testify at a hearing to the camera's capabilities." But the government also asserted that, even had the CCTV camera been closer to the location of the stop, "it is only speculation to think that the camera would have captured anything relevant."

As for the stationhouse cameras, the government's primary argument was that "any video from [those] cameras . . . would be irrelevant and immaterial . . . where the entire incident took place somewhere else." In addition, the government stressed both the newness of this request—asserting the request was "so new that it would cause blisters if it were a pair of shoes"—and the absence of any reason for the government to have anticipated it. The government did not dispute Mr.

Askew's understanding that the MPD had a policy or practice of recording over video footage after ten days.[5]

The court heard argument on the Rule 16 motion at the start of trial in February 2017. Focusing only on what the rotating CCTV camera would have captured, the defense challenged the government's proffer that it was out of range, arguing that the footage would have captured and tested the truth of the "allegation that the headlights were off" and "would have captured some of the interaction [when it was] pointing up Georgia Avenue." Counsel further argued that the government had presented no evidence to support its proffer to the contrary, noting that "the government never pulled a video from another day" (as it had done in other cases counsel had litigated) to show the range of the camera, whereas counsel had appended to his motion a photograph showing the camera's location in relation to the incident. For its part, the government continued to assert that the rotating camera would not have captured either the traffic stop or "the struggle," and in any event that the government never had any reason to preserve that footage because the defense did not specifically request the video from that camera until April 2016, "far after . . . the footage had been written over."

_____

[5] Subsequently, in response to questioning from the court, the government affirmatively expressed its "understanding" that the MPD had such a policy.

Without taking any evidence, the court declined to impose sanctions. Regarding the CCTV footage, the court "agree[d] . . . completely" with the government that because the car was driving southbound and stopped north of the cameras, the rotating camera could not have captured the car's *taillights* even if it were pointing toward the car. But the court did not address whether this camera could have captured Mr. Askew's headlights or his interaction with the police once he was out of the car. The court concluded its discussion of the Rule 16 request for CCTV footage by telling defense counsel "you didn't ask for it, and it wasn't requested until almost three years after the incident."[6]

Regarding the stationhouse footage, the court acknowledged that it "might have shown some things that might have been useful to the defense,"[7] but the court

---

[6] During an earlier discussion about what the government's discovery obligations were, the court indicated it had different expectations depending on the nature of the case. Noting that "misdemeanors come fast and furious," the court observed "there's a limit to what I'm willing to require the prosecutors to do." The court subsequently opined that the police would not have looked for CCTV footage because "[i]t's not a shooting after all." When counsel started to say that in his experience the MPD had looked for such footage in other non-shooting cases, the court responded, "it's very unlikely in a traffic stop that went bad [that] they would be looking at surveillance cameras."

[7] The government had argued that "it's hard to understand how any evidence of the defendant walking through the station house would either support or contradict the government's evidence that the defendant assaulted police

(continued…)

again relied on the fact that "[t]here was . . . no specific request to preserve [this footage] at the time and there would have been no reason for [the government] to preserve it without a specific request." When defense counsel cited this court's recent decision in *Koonce v. District of Columbia*, 111 A.3d 1009 (D.C. 2015), as authority for the proposition that counsel had no obligation to make a specific request because "it should have been obvious" to the government that such video footage needed to be preserved, the court distinguished *Koonce* as addressing only the government's obligation to preserve stationhouse footage in driving under the influence ("DUI") cases.[8]

At trial, the government presented the testimony of the four officer-complainants, who described how the altercation with Mr. Askew had unfolded: Officers Allison Arana and Joshua Arana-Jimenez[9] pulled Mr. Askew over because his car lights were not on. Officer Jimenez asked Mr. Askew to get out of his car in order to place him under arrest for driving with a suspended license. Mr. Askew

---

(…continued)
officers" as charged, but the court had explained that "the question is whether it would tend to show that he also took some lumps, big ones."

[8] Prior to trial the court also ruled on and rejected Mr. Askew's request to continue the trial because of an outstanding motion to issue *Brown* subpoenas. *See infra* II.A.

[9] Officers Arana and Arana-Jimenez married in between the time of the charged assault and the trial.

complied with this directive, but when Officer Jimenez tried to handcuff him, Mr. Askew swung an elbow at Officer Jimenez and took a few steps away from him. Officer Arana and two other officers who had arrived on the scene, Officers Clayton Bass and Joelle Joseph, stepped in to assist with a "tactical takedown" of Mr. Askew, which involved forcibly bringing him to the ground, face down.[10] The officers testified that Mr. Askew resisted, and while doing so was injured. The officers also testified that they incurred a variety of injuries, either directly from Mr. Askew or as a result of trying to subdue him: Officer Jimenez was bitten on his hand; Officer Arana hurt her wrist and scraped her elbow and knee; Officer Bass received an elbow to the face and scraped his knee; and Officer Joseph hurt her hand and wrist. Officer Bass explained there was no body camera footage of this incident because it predated the MPD's issuance of body cameras to its officers.

Through the testimony of these officers, the government admitted a number of photographs and medical records that had been disclosed to the defense pretrial. In addition, two officers testified that they had been treated at the Police and Fire Clinic and either had filled out or been given paperwork related to their injuries

---

[10] A fifth officer subsequently arrived to assist with the arrest, but that officer was not injured and did not testify.

there.[11]  One officer testified that they were all "required" to report to the clinic if they were injured while on duty.  Defense counsel demanded production of those records, and later requested that the charges be dismissed as a sanction for their nonproduction.  Based on representations by the government, however, the court found that the government "d[id]n't have them."  The court acknowledged that whether the government should be deemed to have constructive possession of any records from this clinic was a "novel issue."  But the court declined to address this issue or grant the requested sanction—dismissal—for any Rule 16 violation regarding these records, reasoning both that there had been other means for the defense to obtain them (e.g., via subpoena) and that the defense had obtained other medical records for these officers.

Mr. Askew's theory at trial was that he was acting lawfully to protect himself against the officers' use of excessive force.[12]  Defense counsel argued that

---

[11]  According to the website cited by the government, the Police and Fire Clinic is "a joint venture of Providence Hospital and the Washington Hospital Center . . . [and] a unique privatization project with the government of the District of Columbia"; the Clinic "provides occupational and preventive medical services to the District's more than 6,000 police officers, fire fighters, U.S. Park Police officers[,] and U.S. Secret Service agents."  PFC Assocs., LLC, https://www.pfcassociates.org/index.html https://perma.cc/T8UF-MNUD

[12]  See *infra* note 24.

Mr. Askew had a shoulder problem that he had told Officer Jimenez about[13]—so even the officer's initial act of pulling Mr. Askew's hand behind his back to be handcuffed was excessive force. He further argued that the officers had used excessive force during and after the "tactical takedown,"[14] and that their trial testimony was so incredible the government could not rely on it to prove Mr. Askew's guilt beyond a reasonable doubt.

The court credited the defense witnesses, but did not find that anything they said supported a finding of excessive force. Regarding the government's witnesses, the court acknowledged that there had been "plenty" of "failures of memory, inconsistent memory, [and] inconsistencies internally and externally in the officers' testimony." Noting, however, that "[t]he events occurred almost three and a half years ago," and that the officers had different perspectives on a confusing scene, the court found all four officers "exceedingly credible." Finding that Mr. Askew elbowed and bit Officer Jimenez and kicked at the other officers,

---

[13] Mr. Askew did not testify, but the defense called Ben Titus, who observed the incident from his porch and testified that he heard Mr. Askew shout about a shoulder problem during the struggle. All of the officers denied, or stated that they could not recall, hearing Mr. Askew say he had a shoulder problem.

[14] All officers filled out PD Form 901 "use of force" reports after the incident, and the physician's assistant who treated Mr. Askew afterward testified for the defense about abrasions Mr. Askew had on his forehead, right elbow, and both knees.

"without justifiable and excusable cause," D.C. Code § 22-405(b), the court convicted Mr. Askew of four counts of misdemeanor APO.

## II. Analysis

We begin by addressing the claims by Mr. Askew that we find unpersuasive in II.A–B.; we address his Rule 16 claims in II.C.

### A. Motion to Continue

Mr. Askew argues the trial court should have granted his motion to continue the trial because he had an outstanding motion to issue "*Brown*" subpoenas[15] for government witnesses' medical records. See *supra* note 8. We review the denial of a motion to continue a trial for abuse of discretion. *See Brooks v. United States*, 130 A.3d 952, 960 (D.C. 2016). Based on this record, we discern no abuse.

Six factors are relevant when reviewing a trial court's denial of a request for continuance to gather evidence or obtain a witness: (1) the probative value of the

---

[15] *See Brown* (*Anthony*) *v. United States*, 567 A.2d 426, 428 (D.C. 1989).

evidence sought, (2) the likelihood the evidence can be obtained, (3) whether the party seeking the continuance has exercised due diligence in finding that evidence, (4) the prejudice that would result from the denial of the continuance, (5) the prejudice to the opposing party had the continuance been granted, and (6) the duration of the continuance and its potential disruption or delay of the trial. *Gilliam v. United States*, 80 A.3d 192, 202 (D.C. 2013). In addition, "[i]f the proposed testimony is not relevant or would make no difference in the outcome, a denial of a continuance is not ordinarily an abuse of discretion." *Daley v. United States*, 739 A.2d 814, 818 (D.C. 1999); *see also Johnson v. United States*, 398 A.2d 354, 366 (D.C. 1979). Here, counsel sought a continuance four days before trial to obtain additional medical records and to hire an expert to compare these medical records against the photographs of the officers' injuries prior to trial. But although counsel requested the issuance of a *Brown* subpoena ten months earlier, counsel never got a ruling on his request from the then-assigned trial judge; nor did he seek a ruling from the next two judges assigned to the case, including the judge assigned at the time of trial. Meanwhile, at the time this case went to trial it had been pending for over three years, prompting the court to observe that counsel's effort to consider securing an expert and to press for a ruling was "late in the extreme." In addition, the trial court noted that because the defense already had

photographs of the officer's injuries, it did not see "how [the medical records would] add[] any relevance to what [the defense] need[ed] to do."

Mr. Askew proffers that the probative value of the officer-complainants' medical records would have been for impeachment, providing "invaluable and neutral commentary on the credibility of the witnesses."[16] Mr. Askew does not explain the extent of the prejudice suffered by the absence of those records when he had photographs of the injuries and other impeaching materials which allowed him to call the witnesses' credibility into question. On the opposing side, the government has conceded that "the record does not reveal any specific prejudice to the government" beyond general concerns over fading memories. While it is likely that the evidence could have been obtained with a short continuance and a court subpoena, the trial court properly took into account the fact that, while the defense had shown some diligence in the four months after filing the motion, the defense had not been diligent in contacting or seeking a ruling from the subsequent trial judges in the six months prior to trial. Balancing all of the relevant factors, we cannot say that the court abused its discretion in denying defense counsel's last-

---

[16] Because the charges were now misdemeanors, actual injury to the officers was no longer an element of the offense. *Compare* D.C. Code § 22-405(b), *with* D.C. Code § 22-405(c).

minute request for a continuance to obtain evidence and procure an expert for an issue it had long been aware of in a case that was more than three years old.

### B. *Napue* Claim

Mr. Askew alleges that the government presented "patently false" testimony which it failed to correct in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), when it permitted Officer Jimenez to testify "that he was required to arrest Mr. Askew based on the belief that Mr. Askew was driving [with] a suspended license." It is a "bedrock principle of due process in a criminal trial . . . that the government may neither adduce or use false testimony nor allow testimony known to be false to stand uncorrected." *Longus v. United States*, 52 A.3d 836, 844 (D.C. 2012) (citing *Napue*, 360 U.S. at 269). Mr. Askew's argument fails because it lacks a factual foundation.

When prompted by defense counsel with the question, "You don't arrest everybody who commits a violation of [operating a vehicle after a license suspension (OAS)]?"; Officer Jimenez responded, "We are, [by] our general order, [we] are required to, we shall make an arrest if someone is operating after [a] suspension." When asked whether he was permitted to give citations instead,

Officer Jimenez elaborated that "[t]hrough departmental guidelines, in 2013, the general order specifically says, you shall make an arrest for operating after suspension, meaning we have no discretion." Finally counsel asked, "You are saying you had to arrest [Mr. Askew] . . . because you thought there was a violation of OAS?" and Officer Jimenez responded, "Correct." Counsel did not confront Officer Jimenez with the referenced general order nor any other document to challenge the veracity of his statements, nor did counsel express concern about Officer Jimenez's truthfulness on this point with the court and the government, much less present any evidence that Officer Jimenez's testimony about the general order was false.[17]

To prevail on a claim that the government committed a *Napue* violation, the defense must provide a "sufficient demonstration of uncorrected false testimony." *Mitchell v. United States*, 101 A.3d 1004, 1008 (D.C. 2014). Mr. Askew has made no such demonstration in this case. Nor could he have because, as Officer Jimenez testified, the general order in fact requires the police to arrest someone found to be driving on a suspended license. *See* Metro. Police Dep't, General Order GO-303.01, Traffic Enforcement § I.B.1.e (1992). In his brief to this court, Mr. Askew

---

[17] Even so, the government has not argued that this issue is unpreserved.

relies on (1) the absence of any mention of arrests in D.C. Code § 50-1403.01 (2014 Repl. & 2019 Supp.), the provision setting the penalty for the offense of driving on a suspended or revoked license, and (2) the general observation that "[i]n Superior Court, non-custody traffic arraignment calendars are replete with defendants who have violated that statute," neither of which disproves what the MPD general order in fact says. Devoid of support, Mr. Askew's *Napue* claim borders on frivolous, and we reject it.

## C. Rule 16

Rule 16 imposes upon the government a range of discovery obligations, including (as is pertinent in this case) an obligation to disclose, upon a request by a defendant, (1) "[d]ocuments and [o]bjects," including videos,[18] and (2) "the results or reports of any physical . . . examination[s]." Super. Ct. Crim. R. 16(a)(1)(E)–(F). These items must be "within the government's possession, custody, or control"; "material to preparing the defense," which is not a "high" "threshold";[19]

---

[18] *See Koonce*, 111 A.3d at 1015 n.7.

[19] *Id.* at 1013. "[T]he defendant need only establish a reasonable indication that the requested evidence will either lead to other admissible evidence, assist the defendant in the preparation of witnesses or in corroborating testimony, or be useful as impeachment or rebuttal evidence" in order to satisfy this Rule 16

(continued…)

and, in the case of reports of examinations, the government attorney must also "know[]—or through due diligence could know—that the [examinations] exist[]." *Id.* To ensure that the government can fulfill these disclosure obligations, Rule 16 imposes on the government a duty of preservation. *See Robinson v. United States*, 825 A.2d 318, 328 (D.C. 2003) ("Only if evidence is carefully preserved during the early stages of investigation will disclosure be possible later." (internal quotation marks omitted)).

On appeal, Mr. Askew argues that the trial court erred when it declined to sanction the government for violating Rule 16 by failing to preserve and produce (1) surveillance footage from the rotating MPD-operated video camera located near where he was arrested, (2) footage from any video cameras located inside the police station where Mr. Askew was taken and booked, and (3) medical records for the officers who reported to the Police and Fire Clinic. This court reviews a trial court's "discovery rulings for abuse of discretion, subject to the qualification that the proper construction of Criminal Rule 16 is a legal question as to which our review is *de novo*." *Weems v. United States*, 191 A.3d 296, 300 (D.C. 2018).

---

(…continued)
standard. *Id.* (internal quotation marks omitted). A defendant need not make the *Brady* showing that the information is "favorable to [the] accused," *Brady*, 373 U.S. at 87. *Koonce*, 111 A.3d at 1015 n.9.

## 1.  The CCTV and Stationhouse Video Footage

The trial court declined to sanction the government for failing to disclose to Mr. Askew the requested video footage at least in part because it concluded that the government had no obligation to preserve this footage absent a defense request. As to the CCTV footage, the court explained that the defense "didn't ask for it, and it wasn't requested until almost three years after the incident"; as to the stationhouse footage, the court explained "[t]here was . . . no specific request to preserve [this footage] at the time and there would have been no reason for [the government] to preserve it without a specific request."  For the reasons set forth below, we conclude that the trial court's understanding of the government's preservation obligations was flawed.

The government has a duty under Rule 16 to preserve discoverable items in its possession, custody, or control.  *Koonce*, 111 A.3d at 1013.  This duty is antecedent to its obligation under the rule to disclose these materials upon a defense request and is active even "before prosecution begins."  *Id.* at 1017 (internal quotation marks omitted); *see also Robinson,* 825 A.2d at 328 (rejecting the government's argument that it had no obligation under Rule 16 to produce

evidence that had already been destroyed "because before a request for discovery has been made, the duty of disclosure is operative as a duty of preservation" (internal quotation marks omitted)). And because this duty is active before particular charges have been brought against any defendant, the government's "[d]etermin[ation] whether there is an obligation to preserve evidence depends," not on the government's assessment that it *is* "material to the preparation of the defendant's defense"—but rather "on [the government's] *reasonable expectation* that it will fall within the scope of evidence that is discoverable under Rule 16." *Koonce*, 111 A.3d at 1013, 1017.[20] The government's assessment of what ought to be preserved must be "undertake[n] on a systemic basis, taking into account the discovery potential of evidence it routinely collects or captures (whether on video or by other means) and the steps needed to preserve it[,]" so that the government is in a position to disclose all that the defense is reasonably expected to request. *Id.* at 1017; *see also id.* at 1016–18 (explaining that, once the assessment is made that

---

[20] In *Koonce*, the court rejected the government's argument that its "duty to preserve [wa]s limited to evidence expected to play a significant role in the suspect's defense or that presented an exculpatory value that was apparent before the evidence was destroyed." 111 A.3d at 1016 (internal quotation marks omitted) (explaining this "more stringent" standard applies only when analyzing the government's preservation obligations under the Due Process Clause).

evidence should be preserved, it falls to "the government to establish procedures and practices to preserve such evidence").[21]

Applying this law to the CCTV footage first, we cannot endorse the trial court's general understanding that the government had no obligation under Rule 16 to preserve the video footage of Mr. Askew's encounter with the police, which resulted in assault charges, in the absence of a specific request for disclosure by the defense.

Preliminarily, to the extent the court expressed a view that there is some tier of criminal charges to which the full force of the government's disclosure and antecedent preservation obligations do not apply, we cannot agree. As noted above, see note 6, the trial court stated that there was a "limit to what [it would] require the prosecutors to do" with respect to discovery in misdemeanor cases. But there is no such limit under the law. Rule 16 applies to all criminal cases. Super.

---

[21] Because the government's preservation obligation precedes and is distinct from its production obligation, it may be that the government has a duty to preserve evidence that it ultimately is not obligated to disclose, for example, because evidence that reasonably appears material to the preparation of the defense ultimately is not, either based on the way the government has chosen to prosecute the case, or because the defense makes a Rule 16 request for production that is narrower than anticipated.

Ct. Crim. R. 1(a). Further, the trial court's reliance on the perceived absence of a practice by the police to request to view CCTV footage—which defense counsel disputed—had no place in its analysis to determine whether the government had an obligation under Rule 16 to preserve such video footage for the defense. *See Koonce*, 111 A.3d at 1016–18 (according no significance to the government's interest—or lack thereof—in the video footage at issue). As discussed above, the operative inquiry under Rule 16 is whether the requested documents or items will be of interest to the *defense* and material to its preparation.

More particularly, the court's reliance on the fact that Mr. Askew's earliest discovery requests did not, like his later ones, identify with specificity this CCTV footage was misplaced. As noted above, well before a request for production by the defense has been made, indeed, before a case is formally charged, the government has an obligation under Rule 16 to preserve video footage if there is a reasonable expectation this footage will be discoverable in a future criminal case. The government should have such a reasonable expectation, with or without an actual inquiry from the defense, when a defendant's alleged criminal activity has been captured on police-operated video cameras[22]—the locations of which are

---

[22] The MPD's own policies already contemplate preserving video footage of all manner of crimes. The MPD special order regarding the "Enhanced Use of

(continued…)

readily identifiable on the MPD's website.[23]  Such footage may provide the defense, among other things, confirmation of the strength of the government's case, an investigative lead to assist the defense, or grounds for impeachment at trial.  Competent counsel will want to see it.  The government should expect counsel to ask to view it.

The government argues, however, that it had no preservation obligation with respect to the CCTV footage in this case because it "correctly assumed" that it

_____

(…continued)
CCTV to Combat Crime," SO-06-12, § V.K.4 (2006), requires MPD to preserve any CCTV footage containing evidence of a crime in accordance with its general order regarding the "Preservation of Potentially Discoverable Material," GO-SPT-601.02, § V.B (2004), which in turn imposes on the MPD an obligation to preserve "potentially discoverable material," including "video/audio tapes" for a minimum of three years, or, once the government initiates a criminal case, until the case is disposed of.  This order regarding preservation of CCTV footage is part of the MPD's broader policy to retain video footage in the various ways it may be captured, including, more recently, by body-worn camera.  Metro Police Dep't GO-SPT-302.13, Body-Worn Camera Program §§ V.A.4, V.H (2016) (requiring MPD to preserve all body-worn camera footage involving, among other things, "[a]ll contacts initiated pursuant to a law enforcement investigation," "[a]ll stops" including traffic stops, and all "[u]se of force situations" in all misdemeanor cases for a minimum of three years and "indefinitely" where there is a "[p]ending warrant," "[p]apered case," or "[o]ngoing criminal investigation").  These policies manifest the MPD's awareness of its obligation to put preservation policies into effect, *see Koonce*, 111 A.3d at 1017-18, and additionally put officers on notice of the foreseeable materiality of such video footage.

[23]   *See* CCTV – Neighborhood-Based Cameras, https://mpdc.dc.gov/page/cctv-neighborhood-based-cameras https://perma.cc/C8GK-6QDR.

"was not material to the preparation of [Mr. Askew's] defense." Renewing the argument it made in the trial court, the government asserts that because of the positioning and capabilities of the CCTV cameras, their footage would not have shown either "the basis for the stop" or "the struggle." The government further asserts that Mr. Askew "did not dispute" its proffer at trial that these events "occurred outside of the camera's range." But the record does not support this argument. Both in his written motion for sanctions and in his argument before the court, defense counsel argued that the rotating CCTV camera *would* have captured the condition of Mr. Askew's car and the encounter between Mr. Askew and the police. He further noted that, while he had presented a photograph to the court showing the positioning of the camera with respect to the scene of the alleged assault, the government had put on no evidence (as it had done in other cases he had litigated) to support its proffer. The court's only factual finding regarding the rotating camera's capabilities was that it could not have captured the car's taillights. We are left with unresolved, disputed issues of fact regarding whether the camera could have shown whether the car's headlights were on or off (which was potentially relevant to whether there was a basis for the initial stop) and/or the interactions between Mr. Askew and the officers. Without resolution of these factual issues, we cannot say whether there was a Rule 16 violation, and if so whether a sanction would or would not be warranted. Thus we "find it necessary

to remand the record." *See Laniyan v. United States*, 226 A.3d 1146, 1148, 1153 (D.C. 2020) (citing D.C. Code § 17-306 (2012 Repl.)); *see*, *e.g. Farley v. United States*, 694 A.2d 887, 890 (D.C. 1997) (remanding the record for a hearing and determination of whether a certain document was *Brady* material).

Turning to the court's ruling regarding the video footage at the stationhouse, the court again relied on defense counsel's failure to make a "specific request to preserve" the footage "at the time," in conjunction with its determination that "there would have been no reason for the[] [government] to preserve it without a specific request." Again we disagree with the trial court's narrow interpretation of the government's duty to preserve documents, photographs, videos, and other items subject to disclosure under Rule 16.

We addressed the government's obligation under Rule 16 to preserve stationhouse video footage in *Koonce*. We concluded:

> [I]n the statutory and evidentiary context of DUI/OWI prosecutions, it takes a small, logical step to conclude that video that captures a suspect's appearance, speech[,] or actions soon after arrest and that records when the suspect is being informed of his rights under the statute and asked to submit to [urine or blood-alcohol] testing will be material to the defense and must be preserved for disclosure.

111 A.3d at 1017–18. Similarly, in this case it takes only "a small, logical step," *id.* at 1018, to conclude that video footage of a defendant at the stationhouse after being arrested for APO might well contain information material to the preparation of the defense, both to assess the government's case and to evaluate the possibility of raising an affirmative defense.[24] This includes but is not limited to information about the defendant's and the officers' physical appearance and mobility, demeanor, and statements (defendant's statements are, of course, specifically identified as an item subject to disclosure under Rule 16(a)(1)(A)–(C)), as well as evidence of the interactions between the police and the defendant. *See id.* at 1018. The "straightforward" nature of this assessment, *id.* at 1017, is evidenced by the government's longstanding post-arrest procedures followed in this case, namely to photograph Mr. Askew and the officers at the station and to have the officers complete use of force reports, measures which are designed to serve as a preserved record of the same sort of information likely to be captured in footage of a

---

[24] Because the duty of preservation is active even before charging decisions are made, the duty to preserve turns on the facts of the incident and crimes the government might reasonably charge. Here Mr. Askew was involved in an encounter resulting in injuries to himself and the arresting officers. Although his felony APO charges were downgraded to misdemeanors, either charge allowed for a viable defense on the ground that his use of force was "reasonably necessary under the circumstances" to protect himself against the officers use of excessive force during his arrest. *Nelson (Thomas) v. United States*, 580 A.2d 114, 117 (D.C. 1990) (internal quotation marks omitted); *see also* Criminal Jury Instructions for the District of Columbia, No. 4.114(C) (5th ed. 2019).

defendant and involved officers at the stationhouse.[25] We thus hold that the government's obligation to preserve the stationhouse video footage in this case did not turn on the existence of a request from the defense.[26]

Having determined that the government violated Rule 16 by failing to preserve and produce video footage from the stationhouse, we turn to the question

---

[25] The trial court in this case understood our previous analysis of the government's duty to preserve footage in *Koonce* to be strictly limited to the context of circumstances reasonably leading to a DUI charge. Although we engage in analysis specifically in the context of circumstances reasonably leading to an APO charge here, we stress that this analysis is not limited to DUIs and APOs, but rather to the relationship between the factual circumstances and the charges reasonably likely to be brought. There are undoubtedly other cases where the defendant's physical appearance, demeanor, statements, and interactions with law enforcement should reasonably be anticipated to be material to the defense. Particularly in light of the government's recognition of the need to record and preserve body worn camera footage on the way to and in the stationhouse, *see* GO-SPT-302.13 § V.B.2.c, (requiring officers assigned to transport vehicles and police stations to wear body-worn cameras and abide by the same retention practices for that footage), we expect the government will recognize those situations. But if it does not, we are confident any issues will be litigated in future cases.

[26] Notwithstanding the government's argument that it did not violate Rule 16 "even assuming such [stationhouse] video [of Mr. Askew] existed at one point," there is no disputed issue of fact regarding the stationhouse footage. The government had the opportunity at trial to contest the existence of video footage sought by the defense. It did so regarding the CCTV footage, as discussed above, but it did not with respect to the stationhouse footage. While professing a lack of "aware[ness]" of such footage in its opposition to Mr. Askew's motion for sanctions, it never indicated, either in that pleading or in court, that it had undertaken any inquiry regarding this footage, much less made any sort of proffer to dispute counsel's representation that such footage existed.

of whether the trial court's erroneous ruling to the contrary was harmless. We conduct our review under the test for harm set out in *Kotteakos v. United States*, 328 U.S. 750 (1946) (articulating the test for harm for nonconstitutional errors), and examine whether we can "say[] with fair assurance" that the error did not substantially sway the judgment. *Smith v. United States*, 169 A.3d 887, 891 & n.8 (D.C. 2017) (quoting *Kotteakos*, 328 U.S. at 765). But we are unable to complete this analysis at this juncture because "the standard for reversal where more than one error is asserted on appeal is whether the cumulative impact of the errors substantially influenced the [] verdict." *Sims v. United States*, 213 A.3d 1260, 1272 (D.C. 2019) (quoting *Smith v. United States*, 26 A.3d 248, 264 (D.C. 2011). Given our need to remand the record regarding the government's duty to preserve the CCTV footage, assessment of harm from its failure to preserve stationhouse footage is premature.[27] *See Jackson v. United States*, 768 A.2d 580, 584 (D.C. 2001) ("[W]here [the] court of appeals has an incomplete record upon which to assess harmlessness, remand is appropriate for [the] trial court to make the proper

---

[27] Although we are at this time unable to address whether reversal is required, as in *Koonce* we once again caution that, because the government is now "on notice of its obligations with respect to foreseeably discoverable items of evidence" in its possession, "a lack of willfulness [in their destruction] ceases to be a defense to [a trial court's] sanction for failure to preserve discoverable evidence" when sanctions less than dismissal are requested. 111 A.3d at 1019 (internal quotation marks omitted).

evidentiary record and return the matter to this court.") (internal quotation marks omitted).

## 2. Police and Fire Clinic Medical Records

Mr. Askew argues the trial court erred when it did not sanction the government for its failure to turn over Police and Fire Clinic records for the officers who participated in his arrest. The court stated that it did not know any case law holding that Police and Fire Clinic records were in the possession of the MPD (and thus the prosecution) and subject to disclosure under Rule 16.[28] It appears this court has never considered the status of the Police and Fire Clinic records;[29] we conclude that we need not resolve this question in this case. The

---

[28] *See Weems*, 191 A.3d at 301–02 (explaining that evidence subject to Rule 16 disclosure includes evidence in the government's (1) "actual possession," i.e., "direct physical control"; (2) "custody," i.e., "temporary[] care"; or (3) "control," i.e., when it has the "the legal right and ability to obtain the item from the other entity upon demand" (internal quotation marks omitted)); *Nelson* (*Cornelius*) *v. United States*, 649 A.2d 301, 308 (D.C. 1994) (explaining that Rule 16 does not obligate the government "to obtain [evidence] from private sources [that] it does not intend to use for trial").

[29] Thus, we have not assessed the import of the MPD general order regarding medical services, GO-PER-100.11 §§ V.A.4.a, V.E (2006), alluded to by Officer Jimenez, which requires MPD officers to complete a PD Form 42 (Injury or Illness Report) and report to the Police and Fire Clinic whenever an injury or illness occurs while on duty.

only sanction the defense requested at trial in regards to the Police and Fire Clinic records was dismissal of the charges against him, and Mr. Askew makes no request for lesser sanctions on appeal. Because Mr. Askew never argued, much less demonstrated, that these records were withheld in bad faith, dismissal is neither justified nor required. *See Weems*, 191 A.3d 306–07. Thus, even assuming without deciding that the records were discoverable under Rule 16, the trial court did not abuse its discretion in declining to impose the requested sanction.

## III. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court only in part and we remand the record for a hearing and determination on whether the rotating CCTV camera could in fact have captured the condition of the car that formed the basis for the stop and/or the interaction between the officers and Mr. Askew outside the car. "After the judge issues new findings in accordance with this opinion, the record thus supplemented shall be returned to this court for decision." *Laniyan*, 226 A.3d at 1153.

*So ordered.*