*Notice:* *This opinion is subject to formal revision before publication in the* *Atlantic and Maryland Reporters.* *Users are requested to notify the Clerk of the* *Court of any formal errors so that corrections may be made before the bound* *volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CM-52

LAFFETTE COPELAND, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CMD-10801-19)

(Hon. Carol Dalton, Motion Judge)
(Hon. Robert Okun, Trial Judge)

(Argued October 27, 2021                    Decided March 17, 2022)

*Adrian Madsen* for appellant.

*Mark Hobel*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney at the time, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, and *Andy Wang*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, GLICKMAN, *Associate Judge*, and THOMPSON[*], *Senior Judge*.

---

[*] Senior Judge Thompson was an Associate Judge of the court at the time of argument. On October 4, 2021, she was appointed as a Senior Judge but she continued to serve as an Associate Judge until February 17, 2022. See D.C. Code § 11-1502 & 1504(b)(3) (2012 Repl.). On February 18, 2022, she began her service as a Senior Judge. See D.C. Code § 11-1504.

THOMPSON, *Senior Judge*: Following a bench trial, appellant Laffette Copeland was found guilty of simple assault. She makes several arguments as to why she is entitled to relief from her conviction and/or sentence. First, she argues that the trial court erred in ruling that video footage of the incident was not in the government's possession, custody, or control. Second, she asserts that her pretrial proffers raised an inference that a member of the prosecution team acted in bad faith in failing to preserve video footage, that the trial court erred in failing to hold an evidentiary hearing, and that the court further abused its discretion in denying her motion for dismissal of the charge or other sanction because of the government's violation of Rule 16 of the Superior Court Rules of Criminal Procedure and the Due Process Clause. Third, appellant contends that the trial court abused its discretion in declining to sentence her under the District of Columbia Youth Rehabilitation Act ("YRA").[1] For the reasons discussed below, we vacate the conviction and the trial court's denial of appellant's motion for the sanction of dismissal and remand for further proceedings.

**I.**

---

[1] *See* D.C. Code § 24-903 (2021 Supp.).

On August 19, 2019, appellant was charged by information with simple assault against complainant Natosha Gant-Jones, whom, the government alleged, appellant struck in the face on August 21, 2018, near a District of Columbia building located at 441 4th Street, N.W. At appellant's August 19, 2019, arraignment — almost a year after the incident — defense counsel provided the government a copy of the defense's initial preservation and discovery request, which included a request for any police department video footage recorded within a quarter mile of where the incident occurred. On August 31, 2019, defense counsel sent the government another written discovery request, which specifically sought, inter alia, video footage from the Protective Services Division ("PSD")[2] CCTV mounted on the building located at 441 4th Street, N.W. During a proceeding on September 13, 2019, defense counsel asked in open court that the government provide or permit the defense to inspect "a copy of the [PSD] video footage recorded by the camera at the time and location of the alleged incident."[3]

[2] PSD is a part of the District of Columbia Department of General Services (DGS), which in turn is a "subordinate agency within the executive branch of the District government." D.C. Code § 10-551.01 (2019 Repl.). PSD "coordinat[es], manag[es], and provid[es] security services for District government facilities [including 441 4th Street, N.W.] through the use of special police officers and security officers, . . . civilian employees, or contractors." D.C. Code § 10-551.02(6) (2019 Repl.).

[3] Defense counsel represented to the trial court that the camera "sits directly above th[e] intersection" of 4th and E Streets, N.W.

There followed a September 19, 2019, email in which defense counsel again asked the government for the PSD video footage.

In an e-mail sent on September 25, 2019, government counsel told defense counsel, "There is no surveillance video to produce. I have been informed by our head of security that our footage is in 30 day overwrite mode. Given that this incident happened in August of 2018, no footage would exist now." Another email in the record reveals that the advice from the "head of security" referred to in the September 25, 2019, email actually pertained to surveillance footage from the United States Attorney's Office ("USAO") building located at 555 4th Street, N.W., which "ha[s] a camera that sees the NW corner of the [Fourth and E Streets] intersection (provided it was focused f[o]r the distance involved)." The September 25, 2019, email did not specifically address the availability of footage from the PSD surveillance camera, though the government later represented in its opposition to appellant's motion for dismissal as a discovery sanction that "PSD cameras also operate in 30-day overwrite mode . . . ." The government also stated in its opposition that government counsel had been informed by "[t]he District Office Security Manager" of the USAO Building "that he is not aware of any other camera under federal control that is aimed at the intersection in question." The government acknowledged that the Metropolitan Police Department ("MPD"),

"during the course of its investigation, did not request that any footage be preserved."

On October 14, 2019, "pursuant to Super. Ct. Crim. R. 16 and the Fifth Amendment," appellant moved for the trial court to "dismiss the case against her as a sanction for the government's failure to preserve District of Columbia [PSD] footage showing the events leading up to the alleged incident . . . , the alleged incident itself, and the events following the alleged incident." The government opposed the motion, and appellant filed a reply on November 18, 2019, arguing that because the government "failed to preserve critically important evidence, dismissal is the appropriate remedy."

On November 25, 2019, the trial court (the Honorable Carol Ann Dalton) summarily denied the defense's motion in a one-page written order. At a hearing held that same day, Judge Dalton explained her reasoning as follows: "[I]t was a year after the crime occurred. The case wasn't brought until a year later. There is . . . nothing about it being exculpatory. It's probably at most a black hole, and for that reason, I denied it." Asked by defense counsel to clarify her reasoning, Judge Dalton stated that the requested video footage "was not in the Government's possession, custody, or control."

Appellant's trial occurred later the same day before the Honorable Robert Okun. Government witness Tamara Vines testified that she was a staff assistant with the District of Columbia government working at 441 4th Street. She explained that on the day of the incident, she was headed to lunch when she "saw a woman walk past [her] and then . . . saw two more individuals approach and walk behind the woman," and "maybe five to ten seconds" later, "the woman was hit" twice in the face by appellant, whom Ms. Vines identified in the courtroom. Ms. Vines did not see what, if anything, "precipitated the assault" or "led up to [the incident]" and in particular did not see the victim "swing anything." She also did not see "anything that happened prior to the incident" other than the victim and other individuals walking by her.

Government witness Charlea Robinson testified that she worked at 441 4th Street and was headed to lunch with her coworker, Ms. Vines, on the day of the assault. Ms. Robinson testified that she "saw a woman walking towards the 441 building" and then "saw the defendant and another friend or associate that they had with them . . . ." Ms. Robinson stated that Ms. Vines heard someone "say something, which made [Ms. Vines] turn around, so [Ms. Robinson] turned around with her." As both women turned around, Ms. Robinson saw appellant hit the

victim "[m]ultiple times" and saw the victim fall to the ground. Like Ms. Vines, Ms. Robinson did not see anything that precipitated the assault on the victim, who had been "just walking fast" in the same direction appellant was walking with her back to appellant, and in the opposite direction from the direction Ms. Robinson was walking. Ms. Robinson saw what she described from about 45 feet away and "did not see anything prior to the hit."

The government also called the alleged victim, Ms. Gant-Jones, to testify. She told the court that on the day of the incident, she was at "the missionary place" at 4th and E Streets. She testified that as she was leaving the building, appellant, who was sitting on a wall with several other people, told her "not to come over there." She further testified that as she "started to walk back across the street towards 441 [Fourth Street]" to go to "the child support place," appellant followed her across the street. As she continued walking and was "trying to get into the [441] building," she looked back and saw appellant "charging behind [her]." According to Ms. Gant-Jones, appellant made a fist and was saying something and then "charged off and hit [Ms. Gant-Jones] in [her] face." Ms. Gant-Jones testified that she fell to the ground, and when she got up, she told a woman on the scene to call the police and that appellant was a man, not a woman. She acknowledged knowing that appellant identifies as a woman, but she told the court, "I still say . . .

him because I know it's a man." Ms. Gant-Jones identified appellant in the courtroom as the person who assaulted her and explained that she and appellant "used to hang out together" until appellant accused her of "get[ting] her jumped."

Ms. Gant-Jones acknowledged that she was carrying an umbrella on the day of the incident and that when the police arrived, the umbrella was broken. She identified Defense Exhibit 12 as depicting the broken umbrella. After being asked several times whether she remembered how her umbrella came to be broken, she ultimately replied that she did not know. She denied hitting appellant with the umbrella or hitting appellant in any way. Ms. Gant-Jones confirmed that she had a 2012 conviction of driving under the influence of alcohol and a 2017 conviction of larceny.

During the defense case, appellant testified that she is a transgender woman. She told the court that on the day of the incident, she was with her aunt and cousin near a community shelter when she saw Ms. Gant-Jones walk into the shelter and then walk back out. She said that Ms. Gant-Jones asked her what her group was doing there. Appellant said that she told Ms. Gant-Jones "to leave [them] alone and continue on with her day or continue to go handle her business or whatever she was doing." Appellant testified that she and her cousin then walked towards the

Judiciary Square subway station, and as they were walking towards the station, Ms. Gant-Jones "followed [them] as she had been [doing] all day" and then "got in front of [them]," "walking backwards" while facing appellant, and "would not remove herself from [appellant's] path." Appellant testified that Ms. Gant-Jones then stated, "What's up now" in "a hostile voice and tone" and "with aggression . . . as though she wanted to start a confrontation." Appellant stated that she asked Ms. Gant-Jones "what did she mean" and "told her to continue on and go on about her business." According to appellant, Ms. Gant-Jones then "started to wave her umbrella in [her] face and swing her umbrella towards [her] and at [her]." The umbrella, which was two to three inches from appellant's face, was "closed, but it was extended out, so the point of the umbrella was close to [appellant's] face."

Appellant testified that Ms. Gant-Jones swung the umbrella at her "multiple times," even after appellant asked her stop. As Ms. Gant-Jones continued to swing the umbrella, it hit appellant's forehead, scratching it and leaving a scar. Appellant testified that when the umbrella hit her face, she "felt upset," "felt like [she] was going to be harmed" and "felt like [she] was in danger." Appellant testified that she then "tried to defend [herself]." With Ms. Gant-Jones "still swinging the umbrella and hitting" appellant repeatedly, appellant tried to knock the umbrella out of her hand. When Ms. Gant-Jones still would not let appellant go, appellant

"defended [herself]" and "hit [Ms. Gant-Jones] twice." Appellant said that after she struck Ms. Gant-Jones and was trying to walk towards the subway station to leave, Ms. Gant-Jones "tripped over [a] scooter that was behind her" and "fell and hit her face on the scooter."[4] Appellant testified that Ms. Gant-Jones then "screamed loud and angrily" and said, "Call the police, that's not a woman, that's a man, he hit me."

While Ms. Gant-Jones was still screaming, appellant got on the subway and went home. Appellant did not call the police or report the incident. When asked why she left the scene, she replied, "Because I know from previous times where I have encountered the police and . . . where I've seen other transgender woman encounter situations with the police, . . . it hasn't worked in my favor or I've never seen it work in their favor" and "[police] always see us as the aggressor when it comes to . . . biological or cisgender females."

Judge Okun found appellant guilty of simple assault. He reasoned that there was "really no dispute" that appellant "injured the complaining witness with force and violence and that she did so knowingly and intentionally," since appellant

---

[4] Ms. Gant-Jones testified that she could not recall whether she fell on a scooter.

"herself corroborated the testimony of the complainant and the two eyewitnesses that she hit the complainant two times in the face with her fist." "[T]he real issue," the court found, was self-defense. Judge Okun explained that if he "had heard only the testimony of the defendant and complaining witness, [he] probably would have a reasonable doubt as to whether the defendant acted in self-defense . . . ." He further explained, however, that "the testimony of two eyewitnesses who don't know either the defendant or the complaining witness" was "completely credible," was inconsistent with appellant's account, and "undercut the self-defense argument." Judge Okun sentenced appellant to 180 days of incarceration, execution of sentence suspended as to all, and one year of probation and also ordered her to pay $50 to the Victims of Violent Crime Compensation Fund. He denied appellant's request to be sentenced instead under the YRA and thereafter also issued a written order denying that request.

## II.

We begin our analysis by noting that while appellant's briefs focus on the video footage from both the PSD and USAO cameras, what her motion for

sanctions sought was only dismissal of the case against her "as a sanction for the government's failure to preserve District of Columbia [PSD] footage showing the events leading up to the alleged incident at issue in this case . . . ." We therefore agree with the government that appellant did not preserve a claim as to any footage from the USAO camera. Considering appellant's claim relating to the USAO footage only for plain error,[5] we conclude that it does not entitle appellant to relief. The record contains no evidence or proffer that the USAO camera, located a block north of the block on Fourth Street where the incident occurred, was focused in a way that would have allowed it to capture what, if anything, occurred between appellant and the victim before the charged incident, and appellant therefore cannot show that the trial court obviously erred, or that her substantial rights were affected, by the court's handling of the discovery issue.

As to the PSD footage, appellant argues that because PSD "was actively involved in the investigation of the current case," the PSD video footage was in the

---

[5] To obtain relief on plain-error review on a claim not raised in the trial court, "appellant must show (1) error, (2) that is plain or obvious, (3) that impacts substantial rights, and (4) that would, if not corrected, seriously impact the fairness, integrity, or public reputation of the judicial proceedings." *Rogers v. United States*, 222 A.3d 1046, 1050 (D.C. 2019).

government's "possession, custody, or control."[6] She contends that Judge Dalton erred in finding otherwise and, on that basis, denying her motion for dismissal as a sanction for the government's violation of Rule 16 and the Due Process Clause. Appellant's argument implicates Super. Ct. Crim. Rule 16(a)(1)(E), which provides:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items [that are material to preparing the defense], if the item is within the government's possession, custody, or control and . . . is material to preparing the defense . . . .

This court reviews the trial court's "discovery rulings for abuse of discretion, subject to the qualification that the proper construction of Criminal Rule 16 is a legal question as to which our review is *de novo*." *Weems v. United States*, 191 A.3d 296, 300 (D.C. 2018).

---

[6] Appellant also argues that the footage was in the government's possession, custody, or control because the cameras "were in front of the . . . building [housing the Office of Attorney General for the District of Columbia ("OAG")]," because "OAG is one of the two prosecution entities under District of Columbia law," and because the eyewitnesses who testified at trial "were District employees who worked in the building where the alleged assault took place . . . ." Because we agree with appellant's argument that rests on PSD's role in the investigation of this case, we need not address these additional arguments.

It is well-established in our case law that the disclosure obligations that Rule 16 imposes on the government "apply 'not only to the prosecutor's office, but also to all other investigative agencies of the government' . . . in other words, to the entire 'prosecution team.'" *Id.* (quoting *Myers v. United States*, 15 A.3d 688, 690 (D.C. 2011)). Consistent with our case law, we agree with appellant that the PSD footage was in the government's possession, custody, or control. According to the DGS website, PSD not only "provides 24-hour security and Special Police services that support District government operations, protection of employees, resources, and facilities," but notably also "assists District and Federal agencies during special events and criminal investigations." DGS PROTECTIVE SERVICES DIVISION, DEPT. OF GENERAL SERVICES, https://dgs.dc.gov/page/dgs-protective-services-division; https://perma.cc/U8B5-BK6Q (last visited October 24, 2021). Further, and more to the point in the instant case, the record indicates, and the government's brief acknowledges, that PSD officers assisted responding MPD officers in the investigation of the incident. The Affidavit in Support of an Arrest Warrant stated the following:

> On 08-21-2018, Officer Veronica Perry of DC Protective Services Police took report #18139372 for a "Simple Assault". The offense occurred at 4th and E Street NW (on the NW corner of 441 4th Street NW) at approximately 1245 hours. Officer Perry's report narrative states, "On the listed time, date and location C-1 was assaulted by two unknown individuals that caused

minor injuries to her face. W-1 and W-2 states they observe S-1 and S-2 strike C-1 multiple times in the face. Medic Unit 9 and MPD # 4253 arrived on the scene. AMR# 260 arrived on the scene and transported C-1 to Howard Hospital for further treatment." This case was assigned to Detective David Gargac (hereafter referred to as the "affiant") for further investigation.

As evidenced by the affidavit, PSD provided MPD with key information regarding the assault, including witness statements, which formed the basis for further investigation. MPD is "an integral part of the prosecution team," *Robinson v. United States*, 825 A.2d 318, 328 (D.C. 2003), and we conclude that through its close coordination with MPD in this case, PSD likewise acted as an integral part of the prosecution team.[7]

---

[7] That distinguishes this case from *Myers*, 15 A.3d at 692 ("Since there was no other showing of involvement by the Metro Transit Police at any time in the investigation or prosecution of this case [beyond installation and maintenance by WMATA of a video recording device], we hold that WMATA was not a member of the prosecution team, and thus the video recording – made by WMATA for a purpose unrelated to this case – was never in the 'possession' of the government within the meaning of Rule 16."), and from *Rahman v. United States*, 208 A.3d 734, 740 (D.C. 2019) (explaining that the trial court did not abuse its discretion in finding that a report prepared by a special police officer working for McDonald's was not in the government's possession for purposes of the Jencks Act because there was "no evidence that it was ever provided to the prosecution or police, or that it was used as part of their investigation"). *Cf. Wilson v. United States*, 568 A.2d 817, 821 (D.C. 1990) ("The government cannot compartmentalize WMATA, . . . benefiting by the investigative activities of the WMATA police, but denying having access to WMATA radio transmission runs."), *vacated as moot*, 592 A.2d 480 (D.C. 1991)).

The government asserts that PSD's role in the investigation was "comparatively minimal" and time-limited and argues that PSD therefore cannot properly be considered part of the prosecution team in this case, but we find that PSD's involvement and interaction with MPD officers during the period when (presumably) the video footage would have been most readily available is a more important factor for purposes of our analysis. Moreover, MPD had "a duty to preserve evidence obviously material which . . . the police knew or should have known about, and could have obtained if requested promptly from [PSD,] another government agency."[8] *Id.* at 327. We therefore conclude that the PSD footage was in the government's possession for Rule 16 purposes, and that the government accordingly had an obligation to preserve the PSD video footage. *See Weems*, 191 A.3d at 300-01 (explaining that the duty to permit pretrial discovery "entails an antecedent duty to preserve material that the government has obtained and knows

---

[8] We also note that the fact, alluded to by the trial court, that the charged assault occurred months before appellant's arrest and arraignment and months before the defense team's initial discovery request was of no moment. *See Robinson*, 825 A.2d at 328 ("We are unpersuaded by the government's argument that, by the time the offense was charged or the defense made a request for the recording, the tape in all likelihood had been destroyed, because before a request for discovery has been made, the duty of disclosure is operative as a duty of preservation." (internal quotation marks omitted)); *see also Askew v. United States*, 229 A.3d 1230, 1243 (D.C. 2020) ("[W]ell before a request for production by the defense has been made, indeed, before a case is formally charged, the government has an obligation under Rule 16 to preserve video footage if there is a reasonable expectation this footage will be discoverable in a future criminal case.").

or should know is discoverable"); *Myers*, 15 A.3d at 690 ("[T]he Rule 16 duty to disclose includes an obligation to preserve vital evidence within the government's possession before prosecution begins."). Accordingly, we proceed to consideration of appellant's claim that the trial court further abused its discretion in denying without a hearing appellant's motion for dismissal as a sanction for the government's failure to preserve the video.[9]

We "review de novo whether the court considered the proper factors in assessing whether and how to sanction the government for its Rule 16 violation." *Smith v. United States*, 169 A.3d 887, 891-92 (D.C. 2017). We apply "three criteria for evaluating trial court sanction decisions[:] . . . (1) the degree of government negligence or bad faith involved; (2) the importance of the evidence

---

[9] Regarding a sanction lesser than dismissal, we agree with the government that appellant forfeited her claim by failing to ask for any lesser sanction. *See Crocker v. United States*, 253 A.3d 146, 156-57 (D.C. 2021) ("[W]e confine our discussion to whether appellants were entitled to the specific sanction they sought."). In footnotes, appellant's motion papers "reserve[d] the right to request that the [c]ourt impose an alternative sanction," but she never actually requested that the court do so, including during the hearing in which the court denied the motion. Appellant is correct that the court's statement that its denial of the motion for dismissal was premised on the video footage not being in the government's possession, custody, or control foreclosed *any* sanction, but appellant sought and received that clarification of the court's rationale without having first asked for an alternative, non-dismissal sanction. We therefore are not persuaded by appellant's argument, set out in her reply brief, that "[a]lthough [she] requested [only] the sanction of dismissal, in summarily denying [her] motion . . . the trial court deprived [her] of the opportunity to seek lesser sanctions."

lost; and (3) the evidence of guilt adduced at trial, in order to come to a determination that will serve the ends of justice." *Id.* (brackets omitted). A "merely negligent or good faith failure to preserve discoverable evidence does not automatically require a trial court to impose a penalty," and the court may refuse to apply sanctions. *Weems*, 191 A.3d at 306. We have said that "[t]he deliberate destruction of evidence to hinder the defense generally merits severe sanction, and gross negligence leading to the loss of evidence usually calls for meaningful sanction as well." *Id*. But "[w]hen a defendant seeks the full sanction of dismissal for his case, . . . this court has held that '*Youngblood* . . . controls,' *United States v. Day*, 697 A.2d 31, 36 (D.C. 1997), requiring a showing of bad faith on the part of the police." *Williams v. United States*, 77 A.3d 425, 437-38 (D.C. 2013) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

*Youngblood* establishes that "to show that a failure to preserve discoverable evidence that is 'potentially useful to the defense' violates due process, appellant must . . . establish that the government acted in bad faith." *Koonce v. District of Columbia*, 111 A.3d 1009, 1014 (D.C. 2015) (quoting *Youngblood*, 488 U.S. at 58); *see also Robinson*, 825 A.2d at 325 ("[W]here the exculpatory value of the evidence is unknown, unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a

violation of due process of the law." (internal quotations omitted)). We have acknowledged that under Due Process Clause jurisprudence, "[b]ad faith of constitutional magnitude is shown if the 'evidence . . . possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Koonce*, 111 A.3d at 1014 (alterations in original) (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). However, as we stated in *Koonce*, under Rule 16, the government's duty to preserve is not limited to evidence that had "an exculpatory value that was apparent before the evidence was destroyed"; that, we explained, "is the standard under the Due Process Clause, which is significantly more stringent than the government's discovery obligation under Rule 16 . . . ." *Koonce*, 111 A.3d at 1016. We therefore disagree with the government's argument that appellant's bad-faith claim is fatally undermined by her acknowledgment that she left the scene of the incident without informing PSD or MPD officers of her claim that she acted in self-defense (such that the prosecution team, which heard only the complainant's and eyewitnesses' accounts, had no reason to think that any surveillance video would have exculpatory value).

Appellant contends that her pre-trial proffers "sufficiently raised [an] inference of bad faith" by the government in failing to preserve the videos, such

that the trial court was required to hold an evidentiary hearing to determine the facts bearing on whether there was bad faith. We agree. To be sure, without more, the record that was before the court would not have permitted the court to find that the unavailability of PSD video footage was attributable to bad faith. The government did confirm that a deliberate policy was in play, in that the video surveillance operated pursuant to a "30 day overwrite" policy, but no evidence or proffer confirmed that the video camera was actually operational or suggested that any video footage was destroyed for the purpose of preventing appellant from examining the footage or from making evidentiary use of it at trial. *See Weems*, 191 A.3d at 307 (explaining that police officer's relinquishment of evidence to retail store's "Asset Protection" personnel was deliberate, but that did not mean the officer acted in bad faith). On the other hand, the record left the trial court utterly without information about why the "30-day overwrite" policy was not disturbed after the occurrence of an incident that was referred to the MPD for further investigation, and about why any video footage from the day of the incident was not preserved. The court needed answers to questions such as, "Was the camera operational, and where was it pointed, on the day of the incident?," "Did the MPD and/or PSD officers know there was a camera?," and "Why did the MPD not ask PSD to preserve the video footage?" in order to assess whether bad faith was involved. Because the existing record did not answer those questions, we conclude

that it was an erroneous exercise of discretion for the trial court to deny the sanctions motion without conducting a hearing.

We have said that, "at least in the absence of bad faith on the part of the government, '[e]ven when it appears that the trial court has erroneously exercised its discretion in denying sanctions, we will reverse only if the error substantially prejudiced appellant's rights.'" *Weems*, 191 A.3d at 306 (quoting *Simmons v. United States*, 999 A.2d 898, 901 (D.C. 2010)). In ruling on the sanctions motion, Judge Dalton, who was not apprised of appellant's self-defense claim, observed that she had heard "nothing about [the video] being exculpatory." Now, however, having reviewed the trial evidence, we can say that — unlike the evidence at issue in *Weems* — the video footage, if it existed, could have "weakened" the "proof of appellant's guilt adduced at trial," or might "have exposed material inaccuracies in the testimony of the government's witnesses." *Weems*, 191 A.3d at 307. Judge Okun "reject[ed] the self-defense argument" because he found that the testimony by the government's two eyewitnesses, Ms. Vines and Ms. Robinson, "completely contradict[ed]" appellant's account of what occurred before she hit Ms. Gant-Jones; Judge Okun highlighted that, according to the two eyewitnesses, Ms. Gant-Jones, when walking past them, "was not walking backwards, she was not confronting [appellant], [and] she was not swinging her umbrella" at appellant.

Yet, both eyewitnesses testified that appellant and Ms. Gant-Jones were walking in a direction opposite from the direction they were walking, meaning that for some (however brief) period of time, they had their backs to appellant and Ms. Gant-Jones, such that they had to "turn around" when they heard something said during the incident. Thus, it was undisputed that the eyewitnesses did not see all that occurred and all that the video footage may have captured.[10]

Further, although Judge Okun found appellant guilty, that was not because he found Ms. Gant-Jones's testimony more credible than appellant's; rather, as described above, he explained that if he had heard only the testimony of the two of them, he "probably would have a reasonable doubt as to whether the defendant acted in self-defense . . . ." There were also Ms. Gant-Jones's broken umbrella, the condition of which she was unable to explain despite repeated questioning; the history of the two women, who "used to hang out together" but apparently had a broken relationship by the time of the incident; and what appeared to be Ms. Gant-Jones's bias against appellant, whom she persistently and (at the scene) loudly referred to as a man. Given all the foregoing, we cannot conclude that there was no substantial prejudice to appellant from the non-preservation of any PSD video

---

[10] We note that neither eyewitness testified to having seen what Ms. Gant-Jones described as her "trying to get into the [441] building" before she saw appellant "charging behind [her]."

evidence and from the trial court's having denied the sanctions motion without a hearing.

For all the foregoing reasons, we conclude (1) that appellant is entitled to vacatur of her assault conviction and vacatur of the trial court's denial of her motion for dismissal as a discovery sanction, and (2) that a remand is warranted for the trial court to conduct a hearing to determine whether bad faith underlay the non-preservation of PSD video footage and, if so, whether, the assault charge should be dismissed. If the trial court determines that there was no bad faith, it may reinstate the denial of the dismissal motion and the conviction.

Because of the latter possibility, we now shall briefly discuss appellant's claim that Judge Okun abused his discretion in denying her request to be sentenced under the YRA.[11]

---

[11] The YRA provides that "[i]f the court determines that a youth offender would be better served by probation instead of confinement, it may suspend the imposition or execution of sentence and place the youth offender on probation." D.C. Code § 24-903(a)(1). The court imposed a suspended sentence and probation on appellant; we assume that in pursuing the YRA issue, she hopes to take advantage of other benefits of sentencing under the YRA. *See Latimore v. United States*, 597 A.2d 362, 364 (D.C. 1991) ("[P]erhaps the most important of the [stated purposes of the YRA] is to provide an opportunity for a deserving youth offender to start anew through expungement of h[er] criminal record." (internal quotation marks omitted)).

**III.**

In denying appellant's request to be sentenced under the YRA, Judge Okun explained that he did not find a YRA sentence appropriate because appellant had already been sentenced under the YRA for a prior offense. Because of appellant's recidivism, and because she had continued to test positive for drugs while on release for the present case, Judge Okun declined to sentence her under the YRA. In his subsequent (sealed) written order denying the request, Judge Okun provided an assessment of each of the thirteen factors listed in the YRA. *See* D.C. Code § 24-903(c)(2). He concluded that, overall, the factors weighed against a sentencing under the YRA, due to the nature of the offense in this case, appellant's prior YRA sentence, and her other criminal history.

Appellant, who was twenty-two years old at the time of her testimony, takes issue with Judge Okun's discussion of factors (B), the nature of the offense, and (H), appellant's ability to appreciate the risks and consequences of her conduct. As to factor (B), appellant asserts that the trial court never referred to her as a "youth offender" and characterized her as an adult at the time of the offense, though she was twenty-one years old at the time, thereby "relying upon an incorrect

interpretation of the Act." Although at one point, Judge Okun did refer to appellant as being an adult at the time of the offense, it is clear that Judge Okun understood the relevance of appellant's age when considering whether to sentence her under the YRA. Specifically, in his discussion of factor (A), he noted that appellant was twenty-one years old at the time of the offense and concluded that her age favored imposition of a YRA sentence.

As to factor (H), Judge Okun found that the parties had presented no evidence of appellant's reflection on the "risks and consequences" of her conduct and noted that appellant had expressed no remorse in either her YRA motion or at sentencing. Appellant argues that Judge Okun's comments lack support in the record and show that the court "unlawfully considered and relied upon [appellant's] decision to proceed to trial and to testify that she acted in self-defense." We disagree; our review of the record confirms that appellant did not express remorse or an appreciation of the risks and consequences of her behavior either during her testimony or during the remarks she made at sentencing. We also see nothing in the record that indicates that the trial court relied on appellant's decision to go to trial and to testify in her own defense in evaluating factor (H). In addition, Judge Okun's oral and written explanations indicate that other factors, aside from the two appellant cites, weighed heavily in his determination that

imposition of a YRA sentence would be inappropriate. We are satisfied that the court's sentencing decision "reflect[ed] a thoughtful and conscientious discharge of his sentencing responsibilities." *Veney v. United States*, 681 A.2d 428, 435 (D.C. 1996) (en banc); *see also id.* at 434 (explaining that even if a defendant is eligible for a YRA sentence, "an adult sentence may [nevertheless] be imposed if the record reflects that the [sentencing] judge was aware of the availability under the Act of youth offender treatment, that he considered that rehabilitative option, and that he rejected it").

**IV.**

For the reasons discussed, we vacate appellant's conviction and remand for further proceedings.

*So ordered.*